Wendy **BERKELMAN**, Through Pearl Berkelman, her next friend and natural guardian, et al., Appellants,

v.

**SAN FRANCISCO UNIFIED SCHOOL DISTRICT** et al., Appellees.

No. 73–1686.

United States Court of Appeals, Ninth Circuit.

July 1, 1974.

Susanne Martinez (argued) of Youth Law Center, San Francisco, Cal., for appellants.

Burk Delventhal, Deputy City Atty. (argued), San Francisco, Cal., for appellees.

David M. Heilbron (argued) of McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for intervener.

Before BROWNING, DUNIWAY and GOODWIN, Circuit Judges.

ALFRED T. GOODWIN, Circuit Judge:

The district court denied injunctive and other relief in this civil rights action challenging the San Francisco Unified School District's standards for admitting students to Lowell High School. Appellants, claiming to represent a class of students denied admission, have appealed.

Lowell High School is an academic, or college-preparatory, public high school which accepts each year those applicants for admission whose prior academic achievement places them within approximately the top 15 per cent of the junior-high-school graduates in the district.

The issues on appeal, phrased broadly, are: (1) whether a school district may admit students to a preferred high school on the basis of past academic achievement if the percentage of black, Spanish-American, and low-income students who qualify for admission is substantially disproportionate to the percentage of black, Spanish-American, and low-income students in the school dis-

trict at large;[1] (2) whether a school district, in order to maintain equal numbers of boys and girls in the school, may apply higher admission requirements to girls than to boys.[2]

## I

The district operates eleven high schools. Seven are "comprehensive" high schools, to which students are assigned substantially on the basis of residence. The other four high schools have special educational objectives and accept qualified students from anywhere in the district. Lowell, one of these special schools, offers advanced, college-preparatory courses. Others serve students who need special help because of language or other problems, who work part-time, or who desire vocational training.

Except for students admitted under a pilot minority-admissions program (see n.1), or under the balancing-of-the-sexes policy at issue in this case, admission to Lowell is based solely upon a student's junior-high-school grade-point average in four college-preparatory subjects. All applicants in the district are ranked numerically by their junior-high-school grade-point averages, and students are admitted in their numerical order until their class is filled. Grade averages are not weighted according to schools in which they were earned. All junior-high grades are accepted at face value, regardless of neighborhood or demographic factors that might produce non-

uniformity of grading among junior-high schools.

The statistical data stipulated into this record indicate a lower proportion of low-income students at Lowell than in the high school population city-wide. The data also show that 7.5% of Lowell's students are black, while 25.9% of the district's high school students are black; 5.2% of Lowell's students are Spanish-American, and 13% of the district's high-school students are Spanish-American. The minority percentages in Lowell's student body would be even lower than they are but for the minority-admissions program instituted in 1970.

However, the district-court record reveals that Lowell has not become an exclusive province of the affluent and white. Chinese students contribute 29.8% of Lowell's student body, while they make up only 17.9% of the district's high-school population. Further, 3.2% of Lowell's students are Japanese, and 3.8% are Filipino, while the respective city-wide percentages are 1.9% and 4.5%.

■ There was no evidence that the Board's actions in connection with its administration of Lowell were racially motivated.[3] The admission standard is neither an intentionally discriminatory standard, *cf.* Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), nor a neutral standard applied in an intentionally discriminatory manner, *see* Yick Wo v. Hopkins, 118 U.

---

1. The district has a modified admissions program for black and Spanish-American students which admits members of these groups who would not qualify under the normal admission standards in addition to those black and Spanish-American students who do qualify under the grade-point standard. It is unclear what criteria were used in 1970 and 1971 to select students under this program. Since 1972 a cutoff point one-half point (on a 4-point scale) below regular admissions requirements was used for selection of students in the minority admissions program. Plaintiffs have not attacked this program except to assert that it does not go far enough to bring more minority students into Lowell.

2. A third issue—the unconstitutionality of any academic high school—was abandoned by appellants at oral argument.

3. Appellants argued, in this court, that Keyes v. School District No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), (decided after the district court decision in this case), must be applied to the finding of de jure segregation at the elementary school level in San Francisco in Johnson v. San Francisco Unified School District, 339 F.Supp. 1315 (N.D.Cal.1971), to put the burden on the Board in this case to disprove segregative intent. In light of this court's decision on June 21, 1974, in *Johnson*, 500 F.2d 349 (9th Cir. 1974), the major premise of this argument disappears.

S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Nor do the Board's actions in moving the school building to the far southwest corner (described as a predominantly white area) of the city and in modifying the admission policy indicate intent to insure and increase the underrepresentation of black and Spanish-American students at Lowell. These actions, of themselves, give no evidence of discrimination, and appellants have not offered any additional evidence of racially discriminatory motivation. We note that the admission-policy changes of which appellants complain (e. g., abandoning a form of neighborhood, admission quotas in favor of city-wide admission standards) were accompanied by the development of a pilot minority admissions program. In the absence of proof, appellants' conclusory allegations were insufficient to make the Board's intent a triable question that would frustrate an otherwise appropriate summary judgment.

However, if an admission standard operates in fact to exclude a disproportionate number of black and Spanish-American students from Lowell, the court has a duty to test the constitutionality of that standard.[4] Where a nonsuspect classification (past academic achievement) is alleged to operate to the detriment of a disadvantaged class or classes (black and Spanish-American students), neither "strict" nor "minimal" scrutiny provides useful guidance as a standard of review. The task is to examine the school district's assertion that the standard of past academic achievement substantially furthers the purpose of providing the best education possible for the public-school students in the district.[5] If the past-achievement standard does substantially further that purpose, then the district has not unconstitutionally discriminated in its Lowell admission policy.

The advantages of an "academic" high school offering advanced courses to students who have excelled in a traditional curriculum are obvious. Lowell provides in one school a program which cannot be duplicated in ten other schools any more than special courses for students with specific educational needs can be economically taken from the other special high schools in the city and spread among all eleven schools. The student whose past performance has demonstrated ability to move at an advanced rate in an advanced program will receive a "better" education than he or she would receive if required to work in subject matter and at a pace which does not provide as great an educational challenge. Likewise, a student with an interest in vocational training receives a "better" education if permitted to take vocational courses than if required to continue against his wishes with the "traditional" high-school program. The school district has determined that it is educationally "better" to consolidate special offerings for the benefit of those who can meet the performance standards than to dispense with the effort entirely because budget considerations make it impossible to offer every program at every school.

Conditioning admission to Lowell upon the level of past academic achievement substantially furthers the district's purpose of operating an academic high school. Those students who have best mastered their junior-high-school courses are well prepared for more advanced courses at the high-school level. Of course, it does not necessarily follow that all applicants who fall below the cutoff line are educationally disqualified for

---

4. See Castro v. Beecher, 459 F.2d 725, 733 (1st Cir. 1972); Hobson v. Hansen, 269 F. Supp. 401 (D.D.C.1967), aff'd en banc sub nom. Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969); P. v. Riles, 343 F.Supp. 1306 (N.D.Cal.1972). See also Armstead v. Starkville Municipal Separate School District, 461 F.2d 276 (5th Cir. 1972).

5. One commentator has recently proposed a similar test, labeling it "substantial congruence". Note, Equal Protection and Intelligence Classifications, 26 Stan.L.Rev. 647, 650 (1974). See also Castro v. Beecher, 459 F.2d 725, 733 (1st Cir. 1972).

Lowell's program. The cutoff is the result of space and budget limitations, not the result of a perfect determination of who can and who cannot benefit from the program.

■ Those students not admitted to Lowell are neither denied a quality education nor relegated to an inadequate school. Rather, they attend one of San Francisco's seven "comprehensive" high schools. Unlike a "tracking" system in which the challenged classifications are "predictive" and isolate students of "less promising" ability, the classification here is based upon past achievement impartially measured. There is slight potential for psychic injury to a student from attending a comprehensive high school with the majority of the city's high-school students. *Cf.* Hobson v Hansen, 269 F.Supp. 401 (D.D.C.1967), aff'd en banc sub nom. Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969).[6] We conclude that the district's legitimate interest in establishing an academic high school, admission to which is based upon past achievement, outweighs any harm imagined or suffered by students whose achievement had not qualified them for admission to that school.

Our decision does not mean that we are not troubled by the underrepresentation of some racial and ethnic groups at Lowell. Uncertainty on this score, however, does not mean that the maintenance of Lowell High is itself unconstitutional or that conditioning admission on the basis of past academic achievement is unconstitutional.

■ Nor does the alleged underrepresentation at Lowell of students of low-income families render the admission policy unconstitutional. Low-income persons have no greater status under the equal-protection clause of the Fourteenth Amendment than members of racial minorities. *See, e. g.*, San Antonio School District v. Rodriquez, 411 U.S. 1, 18–29, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971). It follows that since the admission policy is not made unconstitutional by its impact upon black students, it is likewise not made unconstitutional by a similar impact upon low-income students.

## II

Appellants also attack as discrimination on the basis of sex the school district's policy of requiring higher admission standards for girls than for boys. The school district asserts that the standards were designed to produce an equal number of boys and girls at Lowell. This policy has been in effect since 1970. In 1970 and 1971, male applicants were required to have a 3.0 (on a 4-point scale) average, while female applicants were required to have a 3.25 average. In 1972, the requirement for male applicants for admission was raised to 3.25 and the requirement for female applicants was raised to 3.50. Although the school district contends that if qualified males were, in any year, to outnumber qualified females the admission standards would be reversed, the situation has not yet arisen and the district consequently has not yet been put to the test.[7] If the district's argument about maturation and achievement rates is sound, the situation is not likely to arise.

■ Appellants urge us to apply a stringent standard of review, while ap-

---

6. The effect that the presence (or absence) of certain groups of students has upon the quality of education offered in a classroom is a much-discussed topic. *See* U. S. Office of Education, Equality of Educational Opportunity (1966) (the Coleman Report); C. Jenks, Inequality (1972); On Equality of Educational Opportunity (F. Mosteller & D. Moynihan Eds. 1972).

7. Statistics available for fifteen semesters between 1962 and 1969, during which time equal admission standards were applied to males and females show a majority of male students admitted in four semesters, and a majority of females in all other semesters. This may be partially explained by the statistics which show that females exceed one half of the student population at most of the comprehensive high schools in the district.

pellees urge the traditional rational-basis standard of review, in considering discrimination between females and males. Although a majority of the Supreme Court has not yet added sex to its list of suspect classifications, it has suggested that a classification based upon sex will have to be justified by more than the traditional "rational" connection between the classification and some valid legislative purpose. Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). Reed established, and Frontiero reiterated, that governments may not legislate classifications on the basis of criteria not shown to be related to the objective of the statute.

The Reed Court (and implicitly the concurring justices in Frontiero), employed an alternative to both strict and minimal scrutiny. The Court there indicated that sex classifications are to be tested on the basis of strict rationality, a standard of review requiring the government (state or federal) to produce evidence that the challenged classification furthers the central purpose of the classifier. See Gunther, The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1, 21 (1972). Mr. Justice Powell's concurrence in Frontiero indicated that he agreed with the plurality that the evidence was inconclusive and did not satisfy any burden of persuasion. See 411 U.S. at 689–690, 93 S.Ct. 1764.

In both Reed and Frontiero, stereotypes as to the social roles of males and females formed the bases of the classifications. An unsupported notion that an equal number of male and female students is an essential element in a good high-school education was apparently the justification for the school district's policy requiring higher grade-point averages for females than for males.[8] While that policy is not based upon an invidious stereotype such as was present in Reed and Frontiero, we do not read those cases so narrowly as to sanction all other sex discrimination. No actual proof that a balance of the sexes furthers the goal of better academic education was offered by the school district.[9]

■ We note that had the advanced courses been offered in each high school, rather than in a separate high school, and had the school authorities applied the same or similar admission standards to such courses, the admission standards would have been an illegal discrimination on the basis of sex under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681. Although Congress condemned discrimination on the basis of sex in any education program, the prohibition with regard to sex discrimination in admissions to educational institutions was not extended to public secondary schools. 20 U.S.C. § 1681(a)(1). This omission, however, indicates nothing more than that Congress did not know the manner, extent, or rationale of separate education below the college level, and could not anticipate the effect of a prohibition upon such single-sex schools. See 118 Cong.Rec. 5804 (1972). On the other hand, its reasons for prohibiting sex discrimination in educational programs in general bears directly upon this case. Congress recognized that, because education provides access to jobs, sex discrimination in education is potentially destructive to the disfavored sex. 118 Cong.Rec. 5804. Lowell High, as a conduit to better university education and hence to better jobs, is exactly that type of educational program with regard to which Congress

8. The evidence with regard to an alternate explanation—that females get better grades in their early school years but that males catch up with females at the high-school level—was inconclusive.

9. In a similar case, another court, without discussing the "equal numbers" theory, ordered the use of the same standard of admission for boys and girls to an academic high school operated by the Boston public school system. Bray v. Lee, 337 F.Supp. 934 (D.Mass.1972).

**1270**

intended to eliminate sex discrimination when it passed Title IX.

■ On the basis of the foregoing, we hold that the use of higher admission standards for female than for male applicants to Lowell High School violates the Equal Protection Clause of the Fourteenth Amendment.

The judgment of the district court is affirmed in part and reversed in part, and this case is remanded for disposition consistent with this opinion.