Susan Lynn **VORCHHEIMER**, by her parents Bert and Carol Vorchheimer, Guardians ad litem

v.

**SCHOOL DISTRICT OF PHILADELPHIA** and Matthew W. Costanzo, Superintendent School District of Philadelphia.

**Civ. A. No. 74–791.**

United States District Court,
E. D. Pennsylvania.

Aug. 7, 1975.

Sharon Wallis, Eleanor Flick, Philadelphia, Pa., for plaintiff.

Alan H. Gilbert, Law Dept., School District of Philadelphia, Philadelphia, Pa., Thomas N. O'Neill, Jr., Philadelphia, Pa., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

*FINDINGS OF FACT*

1. Plaintiff, Susan Lynn Vorchheimer, 15 years old, is a female citizen of the United States of America. She resides with her parents at 9721 Chapel Road, Philadelphia Pennsylvania. This suit is brought on her behalf by her parents, Bert and Carol Vorchheimer, as guardians ad litem.

2. Defendant School District of Pennsylvania is an agency of the Commonwealth of Pennsylvania which has the responsibility for carrying out the Commonwealth's program of public education in and for the City and County of Philadelphia.

3. Defendant Matthew W. Costanzo is the Superintendent of Schools of the School District of Philadelphia and is sued in his official capacity.

4. In November of 1973, while plaintiff was a ninth grade student at the J. R. Masterman School, a junior high school, plaintiff's parents received a communication from Masterman's principal concerning the various types of senior high schools available to their daughter.

5. This communication listed four types of senior high schools: comprehensive, technical, academic, and "magnet". The two high schools listed under the academic category were Philadelphia High School for Girls and Central High School.

6. This communication stated that "there are specific requirements for admission to [the academic] schools". The communication described these requirements as:

*"Tests*—to be fully qualified a pupil must present a minimum score of 82 percentile, national composite score in the most recent Iowa Tests.

*Achievement*—Must present a record of all "A's" and "B's" with not more than one "C" in any major subject for a full year prior to admission. Marks considered are those from the previous June together with those on the second and subsequent reports of the current school year."

7. Central High School and Girls High (Philadelphia High School for Girls) are the only two academic schools within the Philadelphia School District. These two schools are the only high schools in the Philadelphia School District which draw their student bodies from the entire city. Only 7% of the students in the entire Philadelphia School District are able to meet Central and Girls High admission standards.

8. Both Central and Girls are single sex schools, Central's student body being exclusively male and Girls exclusively female. This segregation by sex has continued, with brief exceptions, since the founding of the two schools and represents the official policy of the Philadelphia School Board.

9. Admission to a comprehensive senior high school is normally based upon a student's residence, i. e., students usually attend the comprehensive high school located in their neighborhood.

10. During December, 1973 and January, 1974, Susan Vorchheimer visited a number of senior high schools in the Philadelphia School District. One school which she visited was George Washington High School, a comprehensive high school which is located in her neighborhood. She also visited Central High School and Girls High.

11. Based on her observations during these visits, and on her past experience in Philadelphia's public schools, plaintiff decided that she wished to attend Central High School. She rejected the idea

of attending Girls High School because, in her words:

"I . . . visited Girls and sat in on one of the classes and walked around and I just didn't like the impression it gave me. I didn't think I would be able to go there for three years and not be harmed in any way by it."

12. On or about January 11, 1974, plaintiff's father submitted on her behalf an application for admission to Central High School for the following year, which application was in accordance with the procedural requirements of defendants' school system. It is undisputed that plaintiff met Central's academic admission requirements.

13. Masterman School is, like Central and Girls, an academic school. It requires that prospective students meet certain admission criteria before they can be admitted. However, Masterman School only offers instruction through the ninth grade.

14. Upon graduating from Masterman, plaintiff received six awards; the award in English, history, science, and geometry, the American Legion award for citizenship and scholarship, and the most outstanding student award.

15. On or about February 1, 1974, plaintiff's application for admission to Central High School was rejected solely on the basis of her sex.

16. Plaintiff is currently in the tenth grade at George Washington High School. Her motivation to achieve good grades has declined, due in part to plaintiff's perception that her teachers expect and demand less work than was expected or demanded at Masterman. Consequently, her grade performance has slipped from its previous level at Masterman.

17. Central High School was founded in 1836 as the first public high school in Philadelphia and the second public high school in the United States. Beginning as a small academic high school with a faculty of four and a student body of 63, Central has consistently maintained a reputation for academic excellence even though it temporarily changed from an academic to a comprehensive high school with an enrollment of 4,000 students around the beginning of the twentieth century. During the nineteenth century members of its faculty were nationally known physicists and English stylists. Its graduates have risen to the top of the business world, the professions, politics, and academia. In February, 1939, after various revisions in its curriculum, Central resumed its original character as an academic high school and opened its new building with 41 faculty members and 1,250 students. At the present time Central has a faculty of over 100 and an enrollment of nearly 2,000.

18. Girls High was organized as an academic high school for females in 1893, having evolved from a school established in 1848 whose primary purpose was to train teachers for the Philadelphia public schools. While the school began by offering commercial, teacher training, and college-preparatory courses, the college-preparatory curriculum quickly overshadowed the other two. By 1910, Girls High was exclusively college preparatory. It has fulfilled the vision of many nineteenth century educators, both men and women, by becoming the equal of Central in preparing its students for college.

19. Many men who are currently prominent in the professional, political, and cultural life of this city and state are graduates of Central. Central has a deserved reputation for training men who will become local and national leaders in all fields of endeavor.

20. Central's academic standing and its reputation as a training ground for community leaders has attracted the attention of national leaders throughout Central's history. In 1842 President Polk visited the school. In 1902 President Theodore Roosevelt visited the school to make a speech in which he told Central's students "Don't flinch, don't foul, and hit the hard line." More re-

cently, then Attorney General Robert Kennedy addressed Central's Alumni Association and 200 student leaders in 1964, and then Vice-President Hubert Humphrey received an award at the school in 1966. The visits of the latter two men were arranged through the auspices of the Barnwell Foundation, which was established by a Central alumnus.

21. The Alumni Association of Central High School is an influential group in Philadelphia, both because of its activities as a group and the individual positions held by its members.

22. The dedication and loyalty of Central's alumni, whether measured by financial contributions or day-to-day participation in matters related to the school, equals the loyalty of many college alumni to their alma mater.

23. While the number of Girls High graduates who have become influential in business, professional, or academic affairs does not approach the number who have graduated from Central, Girls has had a large number of graduates of note in these fields. Among the current community leaders who have graduated from Girls are three judges of the Court of Common Pleas of Philadelphia and the first vice-president of the American Medical Association.

24. The admissions standards of Girls High School are comparable of those of Central High.

25. Graduates of both Central and Girls High, as well as the other senior high schools of Philadelphia, have been and are accepted for matriculation by the best and most prestigious colleges and universities.

26. With the exception of scientific facilities, in which Central is superior, the academic facilities of Central and Girls High are comparable.

27. The courses offered at Girls are similar and of equal quality to those offered at Central.

28. Central High is the only high school in Philadelphia with a substantial private endowment. However, there is no evidence that as a result of this endowment Central's facilities, faculty, or course of instruction is superior to Girls.

29. Both Central and Girls have fewer students than they are physically capable of handling. This is in stark contrast to most of the remaining senior high schools, which are substantially overcrowded.

30. In general, it can be concluded that the education available to the female students at Girls is comparable to that available to the male students at Central.

31. Central and Girls are not the only two single-sex schools in the Philadelphia School District. The Edison High School and the Benjamin Franklin High School admit only males and the Kensington High School admits only females. All three of these schools are comprehensive high schools, which means that they draw their students from the surrounding neighborhood.

32. The practice of educating the sexes separately is a technique that has a long history and world-wide acceptance.

33. There are educators who regard education in a single-sex school as a natural and reasonable educational approach.

34. Dr. M. Elizabeth Tidball, a Professor of Physiology at George Washington University, compared the relative career successfulness, as measured by inclusion in Who's Who of American Women, of women graduates of coed colleges and all women's colleges. She first found that the percentage of women graduating from women's colleges who were later listed in Who's Who was two to three times greater than the percentage of women so listed who were graduates of coeducational institutions. This approximate ratio was constant throughout each decade from the 1910's to the 1950's as well as for the total of all these years.

35. Dr. Tidball's further breakdown of her comparisons revealed a direct and

positive relationship between the number of women who became career-successful (as defined by Dr. Tidball) following graduation from their school and the number of women faculty present in that school's environment at the time the woman was a student there. Her study also revealed a direct, negative relationship between the number of men students present at a college and the number of women "achivers" graduating from the institution.

36. Dr. Tidball found no statistical correlation between the number of men faculty present at a college and the number of women achievers graduating from that institution.

37. There were a greater number of women faculty per women students at the women's colleges studied by Dr. Tidball than at the coed institutions she studied.

38. Dr. Tidball testified that it would not be unreasonable to apply her findings to the secondary level, including academic high schools, since neither she nor anyone else had been able to refute her findings as they applied to the college level.

One factor, however, which mitigates against the applicability of Dr. Tidball's study to students at Central or Girls is the lack of information concerning the academic caliber of the single-sex and coed colleges compared in the study. Dr. Tidball merely selected, at random, a total of 1500 women from three editions of Who's Who of American Women. Of these women, 1100 had graduated from college. Dr. Tidball then obtained data on student enrollment, graduates, and faculty composition for the 59 women's colleges and 289 coeducational colleges and universities attended by the 1100 subjects. While the fact that these institutions graduated women who later appeared in Who's Who might tend to establish these schools as academically superior, Dr. Tidball made no attempt to quantitatively measure the academic achievement of their students.

39. Dr. J. Charles Jones, a Professor of Education at Bucknell University, testified concerning an article which he wrote in conjunction with two other scholars entitled "Coeducation and Adolescent Values". This article was a summary of research conducted on the subject of attitudes among New Zealand secondary students towards school and schoolwork, extracurricular activities, and the approval of their parents and peers.

40. Dr. Jones' study included 1,255 students in their third and fourth years of secondary school in Wellington, New Zealand. Of these students 697 were males, 455 enrolled in an all-boys' school and 242 in a coeducational school. The total of 528 females was divided between 364 in an all-girls' school and 164 in the same coeducational secondary school.

The three schools were similar with respect to curriculum organization, degree of student regimentation, the requirement that all students wear school uniforms, and instructional methods. In Wellington, a small proportion of students elect to attend schools outside their assigned district. However, the large majority attend a particular school because it is in their zone. The girls' school in this study, for example, drew less than 10% of its students from outside its zone.

This pattern of attending the school in one's district was probably accentuated by the fact that instructional programs, whether in single-sex or coeducational schools, were virtually indistinguishable from one another.

All programs were traditional university preparatory curriculum and all were based on syllabi determined by the demands placed upon the schools by the national public examinations for graduation and university entrance.

The study's authors concluded: "While it was not possible to assign students randomly to single-sex or coeducational schools, the above factors, taken in conjunction with the generally egali-

tarian nature of New Zealand society, suggest that the three groups probably did not differ markedly from one another in background or motivation upon entry into secondary school."

41. Dr. Jones asked certain questions of students at both the single-sex and coed high schools. The questions arguably relevant to the matter before us were:

i. "How much time, on the average, do you spend doing homework outside school?"

ii. "Suppose you had an extra hour of school, how would you use it?"

iii. "If you could be remembered here at school for one of the three things listed below (brilliant student; leader in activities; most popular), which one would you want it to be?"

42. The Jones study found statistically significant different between the answers of single-sex students, both boys and girls, and those of coed students to question no. i, *supra*, concerning amount of time spent on homework. 38% of the coed boys reported spending, on the average, between 1½ and 3 hours per day on homework. Over 55% of the boys attending the all-boys school reported averaging this much time. While differences between the two groups of girls were not as great, they were statistically significant. 55% of the girls at the all-girls school spent 1½ to 3 or more hours per day on homework, while 44.6% of the coed girls reported spending this much time.

43. When asked how they would spend a free hour in school if given a free choice, question No. ii, *supra,* coed boys differed from boys attending the all-boys' school to a statistically significant degree. 16% of the coed boys stated that they would spend this hour studying, while 26.8% of the other group indicated studying as their first choice. The differences between coed girls and girls attending the all-girls' school were even greater. Nearly 32% of those attending the girls' school would spend the time studying, as opposed to 12.2% of the coed girls who would spend the time this way.

44. When asked how they would best like to be remembered at their school, as brilliant students, leaders in activities, or as the most popular, question No. iii, *supra,* the coed boys distributed their choices rather uniformly across the three categories while a majority of the boys at the all-boys' school chose being remembered as a brilliant student or a leader in activities. There were however, no statistically significant differences between the two groups of boys. The girls, on the other hand, did differ significantly, with 41% of the girls at the all-girls' school preferring to be remembered as a brilliant student as compared to 25.9% of the coed girls making this choice, and 34.2% of the coed girls wishing to be remembered as "most popular" while 19.4% of the students at the all-girls' school wished to be remembered for this reason.

45. Concerning the applicability of his study to American secondary students, Dr. Jones testified that it would be "almost impossible" to obtain comparable control groups of coed and single-sex students, since most of the American single-sex schools are "either *for superior students rather than for* [a] *random sampling of students,* or they are church-related schools, or they are private schools where one probably could expect that they came from a particular socioeconomic strata." (Tr., p. 161) (emphasis supplied). Due to this discrepancy between the New Zealand and the American single-sex secondary schools, Dr. Jones was reluctant to apply the conclusions of the New Zealand study to American single-sex schools for academically superior students.

46. The Jones study does not indicate that the single-sex character of a school results in better citizenship, or the development of cognitive skills. Nor does it indicate that spending more time on homework will result in greater academic achievement, since the academic

achievement of the New Zealand students on standardized tests was not measured, nor was any gauge made as to any improvement on such tests from pre-high school to graduation. The Jones study merely demonstrates that, on the average, the single-sex students of both sexes who were questioned have a higher regard for scholastic achievement than do the coed students, and that they are more likely on the average to spend more time at homework than the coed students.

47. While the varying amounts of time which the two groups dedicate to homework may indicate a difference in motivation, there may be other factors which explain this difference, and this fact alone does not establish a difference in achievement levels between the students in the different types of schools.

48. The general purposes of the Philadelphia school system are to produce good and constructive citizens, who are literate in every sense, and who are able to communicate effectively. In addition, there is a general goal to teach students saleable skills. (Costanzo Deposition, page 4, lines 16–24).

49. The specific goals of defendants' school system are as follows:

i. increasing the efficiency and basic skills of the students;

ii. providing an extensive network of early childhood programming "with the accent on prevention versus cure" (Costanzo Deposition, page 3, line 25);

iii. providing special education programs which would address themselves to the needs of physically, mentally, and emotionally handicapped children;

iv. providing career education whereby students would be introduced to the world of work and would progressively be provided with more in-depth work experience;

v. providing educational options to students and their parents.

50. Defendants have no independent interest in the number of hours a student spends on homework nightly. Defendants' only interest in the length of time a student, male or female, spends on homework is the effect which it may have on that student's academic performance in school.

51. Although the comprehensive high schools offer some courses similar to those taught at Central or Girls, no other high school in Philadelphia offers the range of courses available at Central or Girls, nor do they have a student body selected solely on the basis of academic performance.

The disparity between the student bodies of the academic high schools and the other high schools is demonstrated by their varying performances on the California Achievement Test, which purports to measure a student's reading ability. No Central or Girls students ranked below the 16th percentile on this test. The next lowest ranking in this percentile was made by the students at Northeast High, with 8% in this percentile; 13% of the students at George Washington High, which plaintiff attends, fell in this percentile. Conversely, 51% of Central's and 43% of Girls' students scored in the 85th and above percentile, while only 20% of the students at Northeast and 16% of the students at Washington came within this category.

For these reasons and because of their academic tradition and self-esteem, Central and Girls offer their students an experience which is more intensely intellectual and a better preparation for the atmosphere of a good liberal arts college than is offered by any of the non-academic high schools. Thus a student seeking this kind of public education in Philadelphia does not have the choice of attending a coed school, but must attend a school of only his or her own sex.

CONCLUSIONS OF LAW

1. This Court has jurisdiction over plaintiff's jurisdiction over plaintiff's federal claim by reason of Title 42 U.S. C. § 1983 and 28 U.S.C. § 1343.

2. This Court declines to accept pendant jurisdiction over plaintiff's

claim under Pennsylvania's Equal Rights Amendment, (Article 1, Section 28 of the Pennsylvania Constitution), since standards governing the applicability of this amendment in the educational field have not been clearly established by the state courts. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Samuel v. University of Pittsburgh,* 375 F.Supp. 1119 (W.D.Pa.1974).

■ 3. This suit is a proper class action under Federal Rule 23(b)(2). Plaintiff is therefore certified pursuant to that subsection as the representative of all those females, who otherwise meet the admission standards of Central High School, who have been, are, or will be denied admission to Central because of their sex.

4. Plaintiff has been denied admission to Central solely because of her sex.

■ 5. Defendants have failed to show that their policy of excluding females from Central bears a "fair and substantial relationship" to any of their legitimate objectives. *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). The analysis performed by Dr. Tidball does not show that males who attend a single-sex school are more likely to be career achievers than those who attend coed schools. It is extremely doubtful that Dr. Tidball's conclusions concerning the correlation between all-women's colleges and career successful women can be applied to women at an academic high school such as Central. Moreover, fostering career successful women is not one of defendants' objectives in excluding women from Central.

Dr. Jones' study also appears to be inapplicable to academic performance at an institution such as Central. Furthermore, defendants failed to affirmatively connect the Jones study findings to any of their educational objectives.

Nor does the record bear out defendant's assertion that maintaining Central as an all-male school promotes educational alternatives. Since a female (or male) student who wishes to attend an academic high school can only attend a single-sex institution, defendant does not provide alternatives at this level.

## MEMORANDUM AND ORDER

This suit is brought by a young woman, Susan Vorchheimer, through her parents against the School Board of Philadelphia and the Superintendent of Philadelphia's public schools, Matthew Costanzo. The young woman seeks admission to Central High School, one of two senior high schools in Philadelphia which limit their enrollment to academically superior students. Admission to Central High School is, as it has been since the school's founding in 1836, available to males only; consequently, Susan Vorchheimer's application to Central was turned down. The parties have stipulated that were Susan Vorchheimer a boy, she would have qualified for admission to Central.

Plaintiff decided not to attend the Philadelphia High School for Girls, Philadelphia's other senior high school for academically superior students, which is all female. She is presently attending George Washington High School, a coed, non-exclusively academic high school located in her neighborhood. At the time she brought this suit she had just graduated from the ninth grade; at the present time she has completed the tenth grade.

The legal questions which this case raises are far more complex than the factual ones, and among the legal questions the question of which standard the Court should use to review the School Board's action is by far the most complex. There can be little doubt, for example, that we are faced with a classification which is based on sex; likewise, the fact that the education available at Girls is substantially equal to that available at Central takes this case out of the

realm of *Brown v. Board of Education*,[1] 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In fact, the outcome of this case depends on which standard of review is applied.

If this case had been brought ten years ago, or perhaps even five, the only precedent to which a court could look would have sanctioned a gender-based classification as long as it was rationally related to some legitimate state interest. *See, e. g., Hoyt v. Florida,* 368 U.S. 57, 82 S.Ct. 159, 7 L:Ed.2d 118 (1961); *Goesaert v. Cleary,* 335 U.S. 464, 69 S. Ct. 198, 93 L.Ed. 163 (1948). These cases not only applied the traditionally permissive "rational relationship" standard to sexual classification but also exhibited the Court's willingness to hypothesize rational relationships on the basis of generalizations which lacked any factual support in the record. In upholding a statute which required women to affirmatively indicate their desire for jury service before they could be picked as jurors, the Court in *Hoyt* stated:

> "Despite the enlightened emancipation of women from the restrictions and protections of bygone years, and their entry into many parts of community life formerly considered to be reserved to men, woman is still regarded as the center of home and family life. We cannot say that it is constitutionally impermissable for a State, acting in pursuit of the general welfare, to conclude that a woman should be relieved from the civil duty of jury service unless she herself determines that such service is consistent with her own special responsibilities." 368 U.S. at 61–62, 82 S.Ct. at 162.

In *Goesaert,* the Court considered a challenge to a Michigan statute which prohibited all women from being licensed as bartenders except for the wife or daughter of the male owner of a licensed liquor establishment. The challenger claimed that it was arbitrary for Michigan to forbid females generally from being barmaids while at the same time excepting the relatives of male tavern owners. The Court first noted that "Michigan could, beyond question, forbid all women from working behind a bar", despite the "vast changes in the social and legal position of women." 335 U.S. 465–466, 69 S.Ct. 199. This was so, the Court said, because:

> "The Constitution does not require legislatures to reflect sociological insight, or shifting social standards, any more than it requires them to keep abreast of the latest scientific standards." 335 U.S. at 466, 69 S.Ct. at 199.

The Court upheld the distinction drawn between women generally and owners' wives and daughters as "not without a basis in reason . . ." 335 U.S. at 467, 69 S.Ct. at 200.

The Court's willingness to uphold legislative restrictions on women in the name of protecting their health or morals was part of its general deference to the legislature in social welfare matters. The minimal "rational relationship" test used by the Court in reviewing disparate treatment of the sexes was the same test it used to review commercial or social welfare legislation which did not infringe some right deemed "fundamental" or which did not classify persons according to such "suspect" categories as race, religion, or national origin. See, generally, Gunther, *Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1, 8–10. Under this test, a state has a wide scope of discretion in

---

1. We reject plaintiff's argument that, given Central's long history, prestige, and long list of notable graduates, the exclusion of women from Central creates a sense of inferiority in Philadelphia's female students which rises to the level of a constitutional deprivation. While the sociological evidence which underlay Brown's finding of inferiority has not been free from challenge, there is no evidence in the present case that such a feeling of inferiority exists.

enacting laws which affect some group of citizens differently than others. As the Supreme Court has stated:

"The [equal protection] safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393(1961).

The Court has emphasized the degree of deference which it will extend to state legislation under the "rational relationship" test in even more forceful terms:

"Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside *only if no grounds can be conceived to justify them."* *McDonald v. Board of Election Comm'rs.,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969)(Emphasis Added).

There can be little doubt that under this standard the School Board's policy of maintaining Central as an all-boys' school would pass constitutional muster. Most likely plaintiff's stipulation that "the practice of educating the sexes separately is a technique that has a long history and world-wide acceptance" ·or that "there are educators who regard education in a single-sex school as a natural and reasonable educational approach" would have proven fatal to her case. Even if this were not so, this Court would probably have felt compelled to validate the sex-segregated school on the basis of Dr. Jones' hypotheses concerning the competition for adolescent energies in a coed school and its detrimental effect on student learning and academic achievement. However, since the time

of the "rational relationship" cases mentioned above, the Supreme Court has made a number of rulings in the equal protection area, the common threads of which are unclear, but the net effect of which has been to take classifications based on sex out of the province of the "rational relationship" standard and to place them in a new and unchartered territory, possibly uninhabited by any other classification.

The first of these cases was *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L. Ed.2d 225 (1971). *Reed* involved the appeal of the adoptive mother of a decedent who had lost the right to administer the estate to the adoptive father due to a state statute requiring that in appointing administrators the probate court was to favor men over women of the same degree of kinship. A unanimous Court declared the statute violative of the equal protection clause. The grounds for this decision were ambiguously set forth in Chief Justice Burger's brief opinion. While it declared that a statute which discriminated on the basis of sex "establishes a classification subject to scrutiny under the Equal Protection Clause", 404 U.S. at 75, 92 S.Ct. at 253, it did not, at least expressly, apply the "strict scrutiny" standard, under which a classification will be upheld only if necessary to achieve a compelling state interest. *See, e. g., Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L. Ed.2d 274 (1972); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L. Ed.2d 600 (1969). Rather, the Court articulated a somewhat more elaborate rational relationship standard to govern the controversy before it:

"The Equal Protection Clause . . . den[ies] to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of the statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair

and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' *Royster Guano Co. v. Virginia,*[2] 253 U.S. 412, 415 [40 S.Ct. 560, 561, 64 L.Ed. 989] (1920)." 404 U.S. at 75–76, 92 S.Ct. at 253.

The Court found "not without some legitimacy" the state's objective of eliminating the necessity for time-consuming hearings to resolve disputes as to which applicant would be a better qualified administrator, but declared that to prefer males over females "merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment." 404 U.S. at 76, 92 S.Ct. at 254.

The description of the gender classification as "arbitrary" in spite of the fact that it obviously furthers the state's "legitimate" objective of more efficient probate administration gave impetus to the assumption that, in dealing with future sexual classifications, the court would apply a more rigorous standard of review than the rational relationship standard. *Berkelman v. San Francisco Unified School Dist.,* 501 F.2d 1264, 1269 (9th Cir. 1974); *Eslinger v. Thomas,* 476 F.2d 225, 231 (4th Cir. 1973); *Green v. Waterford Board of Education,* 473 F.2d 629, 631 (2nd Cir. 1973);

*Gunther, The Supreme Court, 1971 Term-Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L.Rev. 1, 21 (1972).[3] This assumption was reinforced by the fact that the Court refused to follow the reasoning of the Idaho Supreme Court, which had upheld the statute on the grounds that the legislature could reasonably have concluded that men were generally more able to administrate estates than were women, and thus that the classification furthered the state objective of securing the more able administrator. *Reed* made clear that the Supreme Court would no longer generalize about the relative incompetence of women in order to uphold sexually discriminatory classifications. However, the fact that the Court never even discussed this justification left open the question of whether such generalizations were no longer acceptable, or merely whether they would not be accepted without supporting factual evidence.

The latter interpretation was adopted by several lower courts following *Reed.* These courts articulated a "strict rationality" or "intermediate" standard of review, under which the government would be required "to produce evidence that the challenged classification furthers the central purpose of the classifier." *Berkelman v. San Francisco Unified School District, supra,* at 1269.

2. In *Royster* the Supreme Court struck down a Virginia corporate income tax law which exempted domestic corporations which conducted no business within Virginia from a tax on domestic corporations' out-of-state income. The Court stated that "no ground is suggested, nor can we conceive of any, sustaining this exemption . . . ." 253 U.S. at 416, 40 S.Ct. at 562. Justices Brandeis and Holmes dissented on the grounds that the exemption was not clearly unreasonable nor arbitrary. Although the majority opinion used the "fair and substantial relationship" language cited in *Reed,* the language quoted above seems to indicate the Court was applying the traditional "rational relationship" test.

3. In this well-reasoned and well-written article, the development of this standard was viewed as signalling the possible abandonment of the rigid two-tiered equal protection analysis employed by the Warren Court in exchange for a "means-oriented" equal protection standard applicable to all save racial or other formerly "suspect" classifications. *Gunther,* cited *supra,* at 20–25. However, as the author himself notes, *Id.* at 33–34, the applicability of this standard to *Reed* is problematic, since in *Reed* the Court, in effect, held that a legitimate state interest was not compelling enough to justify the challenged classification. "It is difficult to understand [the *Reed*] result without an assumption that some special sensitivity to sex as a classifying factor entered into the analysis." *Gunther,* cited *supra,* at 34.

In *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) decided two years after *Reed,* the Supreme Court dealt with sex discrimination in a manner apparently inconsistent with *Reed.* In *Frontiero,* an Air Force officer attempted to claim her husband as a dependent in order to obtain housing, medical, and other fringe benefits of the service. She was denied these benefits under a statute which required female military personnel to prove that their husbands actually depended on them for at least half of their support while male personnel were not required to prove any actual dependency. The Supreme Court struck down this statute. The plurality opinion, written by Justice Brennan and joined in by Justices Douglas, White and Marshall, found sex to be a "suspect" classification, which could be justified only if necessary to accomplish some compelling state interest. The plurality opinion found that the government had failed to show any rational relationship, let alone a necessary one, to their claimed interest in saving money, and declared that the state's interest in administrative efficiency was insufficiently compelling to justify the suspect classification. Four Justices concurred, on the basis of *Reed.* Justice Rehnquist dissented.

Justice Brennan's, explanation of why sexual classifications should be constitutionally suspect was lucid and compelling.

"There can be no doubt that our Nation has had a long and unfortunate history of sex discrimination. Traditionally, such discrimination was rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women not on a pedestal, but in a cage . . . Throughout much of the 19th Century the position of women in our society was, in many respects, comparable to that of blacks under the pre-Civil War slave codes. Neither slaves nor women could hold office, serve on juries, or bring suit in their own names, and married women traditionally were denied the legal capacity to hold or convey property or to serve as legal guardians of their own children. See generally, L. Kantowitz, *Women and the Law; The Unfinished Revolution* 5–6 (1969); G. Myrdal, *An American Dilemma* 1073 (2d ed. 1962). And although blacks were guaranteed the right to vote in 1870, women were denied even that right— which is itself 'preservative of other basic civil and political rights'—until adoption of the Nineteenth Amendment half a century later.

It is true, of course, that the position of women in America has improved markedly in recent decades. Nevertheless, it can hardly be doubted that, in part because of the high visibility of the sex characteristic, women still face pervasive, although at times more subtle, discrimination in our educational institutions, on the job market and, perhaps most conspicuously, in the political arena. See generally, K. Amundsen, *The Silenced Majority: Women and American Democracy* (1971); the President's Task Force on Women's Rights and Responsibilities, *A Matter of Simple Justice.* (1970)" 411 U.S. at 684–686, 93 S.Ct. at 1769.

The concurring opinions, one by Justice Powell in which the Chief Justice and Justice Blackmun joined, the other, a single sentence long, by Justice Stewart, did not directly meet any of these arguments. Instead, Justice Powell argued that *Reed* offered ample support for the Court's result and that the Court should await the passage of the Equal Rights Amendment before it declared sex a suspect classification. Justice Stewart's concurrence, citing *Reed,* merely stated that the statutes under attack "work[ed] an invidious discrimination in violation of the Constitution." 411 U.S. at 691, 93 S.Ct. at 1773.

In *Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974) and *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975), the

**338**

Court demonstrated that the standard of review was still an unresolved matter in the sexual classification area. In *Kahn,* the Court upheld a Florida statute granting widows[4] a $500 exemption from ad valorem property taxation against the constitutional challenge of a widower denied a similar exemption. The Court noted United States Department of Labor statistics establishing the continuing disparity between the earnings of men and women in the labor market. The Court then declared that while the widower can usually continue the occupation which preceded his spouses death, "in many cases the widow will find herself suddenly forced into a job market with which she is unfamiliar, and in which, because of her former economic dependency, she will have fewer skills to offer." 416 U.S. at 354, 94 S. Ct. at 1737. The Court continued:

"We deal here with a state tax law reasonably designed to further the state policy of cushioning the financial impact of spousal loss upon the sex for whom that loss imposes a disproportionately heavy burden." 416 U.S. at 355, 94 S.Ct. at 1737.

The Court found that, in light of the disparate economic status of widows and widowers, their differing treatment under the Florida statute "rest[s] upon some ground of difference having a fair and substantial relation to the object of the legislation." 416 U.S. at 355, 94 S. Ct. at 1737, quoting *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225.

The Court's opinion in *Kahn* was written by Justice Douglas, who had joined in the plurality opinion in *Frontiero* declaring sex to be a suspect classification. The other Justices who had joined in that opinion all dissented in *Kahn,* principally on the grounds that the statute was not narrowly enough drawn to withstand strict scrutiny. In response to these dissents, Justice Douglas stated that "the dissent would use

the Equal Protection Clause as a vehicle for reinstating notions of substantive due process that have been repudiated." He then declared:

"Gender has never been rejected as an impermissible classification in all instances. Congress has not so far drafted women into the Armed Services. [citation omitted] . . ." 416 U.S. at 356, 94 S.Ct. at 1738.

In *Schlesinger v. Ballard,* cited *supra,* the Court upheld a statute providing for the mandatory discharge of a naval officer after twice failing to be promoted above the grade of lieutenant even though a related statute permitted a female officer of the same grade to remain in the service for thirteen years before she could be discharged for want of promotion. Plaintiff was a male officer who had been discharged pursuant to the statute applicable to men. The Court distinguished *Reed* and *Frontiero* as follows:

"In both *Reed* and *Frontiero* the challenged classifications based on sex were premised on overbroad generalizations that could not be tolerated under the Constitution. In *Reed,* the assumption underlying the Idaho statute was that men would generally be better estate administrators than women. In *Frontiero,* the assumption underlying the federal armed services benefit statutes was that female spouses of servicemen would normally be dependent upon their husbands, while male spouses of servicewomen would not.

"In contrast, the different treatment of men and women naval officers under [the challenged sections] reflects, not archaic and overbroad generalizations, but, instead, the demonstrable fact that male and female line officers in the Navy are *not* similarly situated with respect to opportunities for professional service." 419 U.S. at 508, 95 S.Ct. at 577, 42 L.Ed. 2d at 618. (emphasis in original)

4. The statute granted a similar exemption to every bona fide Florida resident who had lost a limb or been disabled in war or military hostilities or by misfortune.

The Court concluded that "Congress may thus quite rationally have believed that women line officers had less opportunity for promotion than did their male counterparts, and that a longer period of tenure for women officers would, therefore, be consistent with the goal to provide women officers with 'fair and equitable career advancement programs.' [citation to House Report omitted]. Cf. *Kahn v. Shevin,* 416 U.S. 351 [94 S.Ct. 1734, 40 L.Ed.2d 189]." At 508, 95 S.Ct. at 577, 42 L.Ed.2d at 618.

Justice Brennan, with whom Justices Douglas and Marshall joined, dissented on the grounds that the majority had failed to apply the strict scrutiny test and, furthermore, that the majority had invented a governmental interest to justify the differential which interest did not, in fact, exist.

Both *Kahn* and *Ballard* reflect an unwillingness on the Court's part to overthrow legislation which it perceives as intended to benefit women, either economically or professionally. Justice Douglas, writing for the Court in *Kahn,* drew a distinction between statutes "designed to rectify the effects of past discrimination against women" and those which "seize upon a group—women—who have historically suffered discrimination in employment, and rely on the effects of this past discrimination as a justification for heaping on additional economic disadvantages." 416 U.S. at 355, 94 S.Ct. at 1737, quoting *Frontiero v. Richardson,* 411 U.S. 677, 689 n. 22, 93 S.Ct. 1764, 36 L.Ed.2d 583. However, these cases did not resolve the question of how critically the Court will examine the nexus between the classification and the state's interest in these "beneficial" situations. The Court in *Kahn* referred to several statistical surveys, but these merely illustrated disparity earnings of women workers and men workers, not that a $500 widow's exemption would measurably decrease this disparity. The *Ballard* Court referred to "the *demonstrable* fact that male and female line officers in the Navy are not similarly situated with respect to opportunities for professional service." 419 U.S. at 508, 95 S.Ct. at 577, 42 L.Ed.2d at 618. (emphasis added). However, again, no evidence was presented to show that the means supposedly chosen to lessen this differential—giving women a 13 year period before they could be discharged for want of promotion—actually furthered this objective. These cases seemed to cast further doubt on the concept of "strict rationality", or intermediate review, insecurely resting as it did upon the foundation of the Court's opinion in *Reed.*

Shortly after the *Ballard* decision was announced, the Court again faced a sex discrimination issue in *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). In *Wiesenfeld* the Court struck down a provision of the Social Security laws which allowed both a widow and her minor children to receive payments based on the deceased's spouse's earnings, but which allowed such payments only to the minor children if the surviving spouse is male. A male whose deceased wife's earnings were the couple's principal source of support during their marriage claimed that the statute unlawfully discriminated against him on the basis of his sex.

The Court found the assumption underlying the statute in *Wiesenfeld,* namely, that male workers' earnings are vital to the support of their families, while the earnings of female wage-earners do not significantly contribute to their families' support, to be one of the "archaic and overbroad generalization that could not be tolerated under the Constitution." At 643, 95 S.Ct. at 1231, 43 L.Ed.2d at 521–522, quoting *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 618.

Finding the purpose of the legislation to be the payment of a wage earner's dependents on the basis of their probable need, the Court presumed that in ruling out widowers as beneficiaries Congress had acted on the then generally accepted presumption that a man is responsible

for the support of his wife and child. However, while remarking that this presumption was ". . . not entirely without empirical support . . .", the Court declared that "such a gender-based generalization cannot suffice to justify the denigration of the efforts of women who do work and whose earnings contribute significantly to their families' support." At 645, 95 S.Ct. at 1232, 43 L.Ed.2d at 523. No Justices dissented from this result.

The most recent of the Supreme Court cases dealing with sexual classifications is *Stanton v. Stanton*, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975). In *Stanton* the Court found that a Utah statute which specified a greater age of majority for males than for females in the context of child support payments violated the female child's right to the equal protection of the laws. Declaring that it was "unnecessary in this case to decide whether a classification based on sex is inherently suspect . . ." At 13, 95 S.Ct. at 1377, 43 L.Ed.2d at 694, the Court, per Justice Blackmun, concluded that ". . . under any test compelling state interest, or rational basis, or something in between—[the statute], in the context of child support, does not survive an equal protection attack." At 17, 95 S.Ct. at 1379, 43 L. Ed.2d at 696.

While the Court did not specify the standard which it used to measure the Utah statute's constitutionality, it clearly subjected the reasons offered to support the statute to a greater scrutiny than that traditionally extended to commercial or social welfare legislation. See p. 334, *supra*. The Court first took note of the rationale the Utah Supreme Court had employed in upholding the statute:

"It may be true, as the Utah court observed and as is argued here, that it is the man's primary responsibility to provide a home and that it is salutary for him to have education and training before he assumes that responsibility; that girls tend to mature ear-

lier than boys; and that females tend to marry earlier than males . . ." The Court then declared:

"Notwithstanding the 'old notions' to which the Utah court referred, we perceive nothing rational in the distinction drawn by [the statute] . . . A child, male or female, is still a child. No longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas. [citation omitted]. Women's activities and responsibilities are increasing and expanding. Coeducation is a fact, not a rarity. The presence of women in business, in the professions, in government and, indeed, in all walks of life where education is a desirable, if not always a necessary antecedent, is apparent and a proper subject of judicial notice. If a specified age of minority is required for the boy in order to assure him parental support while he attains his education and training, so, too, it is for the girl. To distinguish between the two on educational grounds is to be self-serving: if the female is not to be supported so long as the male, she hardly can be expected to attend school as long as he does, and bringing her education to an end earlier coincides with the role-typing society has long imposed. And if any weight remains in this day in the claim of earlier maturity of the female, with a concomitant inference of absence of need for support beyond 18, we fail to perceive its *unquestioned truth* or its significance, particularly when marriage, as the statute provides, terminates minority for a person of either sex." At 14, 95 S.Ct. at 1378, 43 L. Ed. at 695. (emphasis added).

## ANALYSIS OF SUPREME COURT CASES

A lower court faced with this line of cases has an uncomfortable feeling, somewhat similar to a man playing a shell game who is not absolutely sure

there is a pea.[5] One interpretation which might reconcile these cases is that sexual classifications cannot be used merely to achieve administrative efficiency or economy, but they may be used to further other, more substantive state interests. This interpretation reconciles the holdings in *Reed* and *Frontiero*, and is suggested by the Court's dicta in *Kahn* and *Ballard*.[6] However, this interpretation ignores the reasoning of *Wiesenfeld*, where a classification was voided even though, as the Court admitted, there was empirical evidence that it furthered a state interest other than administrative efficiency or economy. Moreover, this interpretation ignores the passionate opinions, both majority and dissenting, portraying the injustices which women have suffered and the arbitrariness of many gender-based classifications.

A second possible interpretation is that the Court will impose the "strict rationality" standard in any case in which a classification along sexual lines is challenged, and will uphold such classifications only if the state is able to show that they in fact further a legiti-mate state interest. While this interpretation would seem to fit the *Wiesenfeld* and *Stanton* cases, it cannot explain the reasoning of *Kahn*, nor, perhaps, of *Ballard*. Conversely, an interpretation which posits the Court applying the traditionally, permissive "rational relationship" test might explain *Kahn* and *Ballard* but would flounder on the shoals of *Wiesenfeld* and *Stanton*.

A third possibility is that the Court is not applying a uniform standard in reviewing sexual classifications, but will apply a different standard depending on whether the classification is viewed as beneficial or adverse to women. Cf. *Kohr v. Weinberger*, 378 F.Supp. 1299 (E.D.Pa.1974); See also Note, The Emerging Bifurcated Standard for Classifications Based on Sex, 1975 Duke L. J. 163–187. When reviewing a sexual classification whose effect was seen as harming women, the Court would apply a strict rationality test, *Wiesenfeld; Stanton;* cited *supra,* but when the classification is seen as alleviating the oppressed status of women in society, the Court will apply the permissive "rational relationship" test.[7]

---

5. The cases dealing with sex-segregated educational institutions give us little guidance in this case. In *Williams v. McNair*, 316 F. Supp. 134 (D.S.C.1970), aff'd, 401 U.S. 951, 91 S.Ct. 976, 28 L.Ed.2d 235 (1971), the Court upheld the exclusion of males from an all-female college. This case was decided prior to *Reed v. Reed*, and its applicability to exclusion from an all-male institution is tenuous. (However, the *Williams* case probably still represents good law as far as the exclusion of males from an all-girls' educational institution is concerned). *Kirstein v. Rector and Vistors of University of Virginia*, 309 F.Supp. 184 (D.C.Va.1970), the court found that the state-supported colleges available to women were academically inferior to those available to men. *Edwards v. Schlesinger*, 377 F.Supp. 1091 (D.C.D.C. 1974) involved a challenge to the all-male admissions policies of the United States Naval and Air Force Academies. While that court interpreted *Reed* as following the permissive "rational relationship" test, it is clear that the exclusion of women bore a fair and substantial relationship under the strict rationality test to the Services' objec-tives of preparing their academy graduates for combat duty.

6. This interpretation was expressly adopted by the Court in *Edwards v. Schlesinger*, 377 F.Supp. 1091 (D.C.D.C.1974).

7. A further refinement of this approach is that the Court would only require proof of the justification underlying a sexual classification adversely affecting females if that justification is a gender-based generalization, such as the generalization that men are better able to administer estates than women, *Reed v. Reed*, cited *supra,* or the generalization that men rather than women are the family's provider. *Wiesenfeld,* cited *supra.* Conversely, the Court will not require proof of such gender-based generalizations if the classification which is based on them is seen as aiding females. *Ballard,* cited supra.

In the present case, defendants do not rely on any gender-based generalizations to justify Central's continued all-male status. The generalizations which they do rely on pertain to adolescent students of both sexes, namely that high-school students will work harder and do better in single-sex schools than in

This standard, or standards, is not without its problems. How does a court decide which legislation helps and which legislation hurts women? That this problem is not a judge's fantasy can be seen by comparing the Supreme Court's invalidation of the statute in *Wiesenfeld* even though that statute granted its benefits only to women, and its decision in *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), that pregnancy is not a gender-based classification.

The problem of identifying, in normative terms, the impact of the challenged classification on women is present to some degree in the instant case. That keeping women out of Central High has an adverse impact on them seems obvious; yet defendants can argue that the existence of Girls makes the impact of exclusion from Central neutral at worst.[8] However, this argument overlooks Susan Vorchheimer's expressed desire to attend Central, a desire which, in light of Central's history and reputation, does not seem frivolous or eccentric. More importantly, the existence of Girls does not satisfy plaintiff's, or any other girl's desire to attend a coed academic school.

■ The result of defendants' policy of excluding young women from Central

is to deny them the opportunity to attend a coeducational, academically superior, public high school. We believe that this denial is significant enough, in light of plaintiff's express wishes and the evidence of her performance since her rejection, to justify the conclusion that it has an adverse impact on her and on other women.

Defendants could further argue that the purpose of excluding women from Central is to protect them from the disadvantages of coeducation. To begin with, the evidence presented by defendants does not establish that coeducation at an academic high school such as Central would have a detrimental effect on female students. But if such detrimental effects are assumed, the School Board could not then justify its policy of committing the vast majority of its female students to coed schools. Simply put, if coeducation is detrimental to girls, all the public schools should be sex-segregated; if it is not, then there is no "fair and substantial" relationship between sex-segregation and the educational goals of School Board. The fundamental inconsistency which would result if the School Board argues that it keeps girls out of Central for their own protection reveals that males, and not females, are the intended beneficiaries of defendants' exclusionary policy.

coed schools. However, we do not believe that the absence of a gender-based generalization takes this case out of the line of *Reed* and its progeny. As a court has stated in invalidating a school board's policy of enforcing a 50-50 ratio between males and females in an academic high school by denying admission to women who were more qualified than men:

"In both *Reed* and *Frontiero*, stereotypes as to the social roles of males and females formed the bases of the classifications. An unsupported notion that an equal number of male and female students is an essential element in a good high-school education was apparently the justification for the school district's policy requiring higher grade-point averages for females than for males. *While that policy is not based upon an invidious stereotype such as was present in Reed and Frontiero, we do not read those cases so narrowly as to sanc-*

*tion all other sex discrimination. No actual proof that a balance of the sexes furthers the goal of better academic education was offered by the school district." Berkelman v. San Francisco Unified School District*, 501 F.2d 1264, 1269 (9th Cir. 1974). (emphasis added).

8. Another way of saying this is that the classification drawn here, when viewed in its totality, discriminates in favor of single-sex institutions and against coed ones, not in favor of men against women. If the classification is seen this way, the exclusion of a male from Girls would cancel out the effect of the exclusion of a female from Central. However, Susan Vorchheimer only challenges the portion of defendants' policy which relates to Central, from which she was rejected solely because of her sex. In this sense, defendants' classification is undeniably a sexual one.

Having identified this classification as adversely affecting women, we need not search for conceivable justifications for it, but may examine the evidence before us to see if it establishes "a fair and substantial relationship" to the School Board's legitimate interests. We find that it does not. Dr. Tidball's study demonstrates that single-sex education at the college level is more likely to aid a woman in developing her potential for achievement than is coed education; this study did not purport to investigate or conclude that male students are so aided. Dr. Jones' study demonstrates that both male and female students at single-sex schools in a certain environment are more likely to study longer, and value scholarship (or at least brilliance) more highly, than do their coed counterparts. The application of the Jones' study's results and conclusions to Central is problematic at best, but even if they are taken as accurate predictions of performance at a coed Central they have not been shown to relate to any of defendants' legitimate objectives. We cannot conclude without some evidence that the differences in time spent in homework or the differences in attitudes towards scholarship represented in the Jones study would have an appreciable impact on academic achievement, let alone the development of literate citizens with saleable skills. As for the School Board's stated interest in offering its students and their parents the alternative of single-sex education, this "alternative" turns out to be the only choice available to the student who wishes to attend an academic senior high school in Philadelphia.

### ORDER

And now, to wit, this 7th day of August, 1975, after a hearing and upon consideration of the briefs and arguments of the parties and the arguments of intervenor defendants, judgment is hereby entered in favor of plaintiff and the class she represents and against defendants on plaintiff's claim arising under the Equal Protection Clause of the Fourteenth Amendment. Defendants are enjoined from refusing to admit plaintiff or any other member of the class she represents to Central High School solely on the basis of sex.

And it is so ordered.