## Newberg v. Board of Public Education

*Arthur H. Bryant, Rita L. Bernstein* and *Susan Cary Nicholas,* for plaintiff.

*Andrew M. Rosen, Barry M. Klaymon, Doris A. Pechkurow* and *Jeffrey W. Golon,* for defendants.

MARUTANI, *J.,* September 28, 1983—

## PRELIMINARY STATEMENT

Before this court is a class-action proceeding[1] by three female students whose applications for admission to Central High School, an all-male public institution in Philadelphia, had been rejected solely on the basis of the applicants' sex. Plaintiffs challenge such sex-based rejections as being violative of their rights in derogation of the provisions of the

amendment of May 18, 1971—the so-called "Equal Rights Amendment"—to the Constitution of the Commonwealth of Pennsylvania,[2] as well as Article I, Sections 1 and 26 of the same Constitution,[3] and the "equal protection" provision of the Fourteenth Amendment.[4] Plaintiffs seek a declaration holding defendants' policy to be unconstitutional and therefore seek to enjoin defendants from excluding female students from admission to Central High School on the basis of their sex alone.

## FINDINGS OF FACT[5]

1. Plaintiffs are each 16-year-old female citizens of Pennsylvania, acting by their respective parents and natural guardians, as follows: (a) Elizabeth Newberg, by her parents and guardians, Herbert Newberg and Babette Josephs; (b) Pauline H. King, by her father and guardian, Hugh King; and (c) Jessica S. Bonn, by her parents and guardians, Anne and Jerrold Bonn. Prior to the 1982-83 academic year, all three student-plaintiffs had applied for admission to Central High School for their junior year of schooling, and all three were rejected solely on the basis of their sex.

2. Defendants are: (a) Board of Public Education, an agency of the Commonwealth of Pennsylvania, with the responsibility to define the general policies of, and to administer the School District of Philadelphia; (b) School District of Philadelphia, also an agency of the Commonwealth of Pennsylvania, with responsibility to carry out the Commonwealth's program of public education in Philadelphia; (c) Constance E. Clayton, Superintendent of Schools of the School District of Philadelphia;[6] and (d) Richard D. Hanusey, Associate Superintendent for Field Operations of the School District of Philadelphia.

*Basic Types of Schools Conducted:*

3. The School District of Philadelphia (School District) basically operates two types, or levels, of schools: (a) "comprehensive" or neighborhood schools, and (b) "magnet" or special admission schools.[7] For admission to this latter category of schools, an applicant must satisfy special requirements. Both Central High School (Central High) and Philadelphia High School for Girls (Girls High) are special admission schools, and are "the only solely college preparatory schools in Philadelphia";[8] both schools require, as a condition of admission, specified demonstrated levels of scholastic achievement and specified scores on the California Achievement Test.[9]

*Single-Gender Schools (Two):*

4. Central High and Girls High, restricted by gender to males and females respectively, are the only single-gender schools in the entire Philadelphia public school system—whether comprehensive (neighborhood) or magnet (special admission) schools, and whether high school or lesser grades.[10]

5. However, on occasion, students from Girls High have, by special permission, taken courses at Central High: during the 1981-82 academic year, six students from Girls High took courses at Central High,[11] and in 1982-83 one student took a course at Central High.[12] Students at Girls High are not informed either of the possible option of taking courses at Central High or of the course offerings at Central High. There is no known instance of a student at Central High seeking to take a course at Girls High.

*Degrees and Diplomas:*

6. Graduates of Central High who have passed all major subjects after ninth grade, are awarded "Bachelor of Arts" degrees,[13] whereas graduates of all other high schools, including Girls High, receive

high school diplomas. Those Girls High students who take courses at Central High are neither eligible to receive nor do receive Central High's "Bachelor of Arts" degree.

*Class Sizes, Administrative and Teaching Personnel:*

7. School maximum capacity, student enrollment, average class size, and student-teacher ratio for each of the two schools in question, are:

| School | Enrollment (1982-1983) | Class Size (Averages for 1978-1983 | Student-Teacher Ratio (Averages for 1978-1983) |
|---|---|---|---|
| Central High: | | | |
| (Cap.: 1,985) | 1,095 | 23.5 | 19.02 |
| Girls High: | | | |
| (Cap.: 1,861) | 1,416 | 25.7 | 19.70 |

Thus, Central High's enrollment for the latest academic year was 55 percent of capacity, and that of Girls High was 76 percent of capacity. The average class size for the period of 1978-1983 was 2.2 students larger for Girls High than for Central High; however, the average student-teacher ratio during this same period was lower for Central High by .68 students.[14]

8. During this same period of 1978-1983, the average percentages of teachers with Ph.D. degrees and those with 21 years or more of teaching experience at the two schools were:[15]

| | Central High | Girls High | Difference (percent) |
|---|---|---|---|
| Ph.D.'s (percent) | 8.98 | 3.30 | 5.68 |
| 21 Years Experience (percent) | 49.54 | 31.90 | 17.64 |

9. The chief administrators of the two schools are titled "President" for Central High and "Principal" for Girls High.[16]

*Academic Facilities and Materials:*

10. The respective sizes of the campuses of the two schools are: Central High—1,376,496 square feet; Girls High—463,000 square feet.[17] Thus, Central High's campus is approximately three times larger than that of Girls High.

Central High's campus includes: indoor basketball courts, a football field with a stadium, a baseball field, a field house; and three tennis courts and outdoor basketball courts which are, however, in disrepair.

Girls High's campus includes: indoor basketball courts, a hockey field and three (usable) tennis courts. Girls High's tennis courts are used by Central High students.

The auditoriums of both schools are comparable in terms of a seating capacity of approximately 1,000—the Girls High auditorium having a lesser seating capacity by approximately 200. However, the Girls High auditorium has an orchestra pit, which Central High's auditorium lacks.[18]

11. Central High's library contains almost twice as many books as Girls High's—50,000 to 26,300 books. Central High's library has 97 different magazines and Girls High's has 77.[19] Whereas Girls High's library is located on a single level in a room with a somewhat low ceiling, the library of Central High is situated in a multi-story room with semi-circular, open stairways leading to the upper level and stack shelvings of books.

12. As to some of the instructional equipment, Central High has: twice as many computers—25 to Girls High's 12, and a separate computer room, which Girls High lacks; a 35 mm. camera and several motion picture cameras, whereas Girls High has none; a planetarium (periodically inoperative) and a cyclotron (inoperative), neither of which exists at Girls High.[20]

*Academic Courses and Activities:*

13. At least in recent years, Central High offered a four-year sequence of courses in Russian, a course not available at Girls High; on the other hand, Girls High has advanced courses in French and Spanish languages not available at Central High.[21]

14. Central High students have available to them three separate courses in calculus: two regular Calculus courses and one Advanced Placement Calculus; on the other hand, Girls High students have available to them a single course entitled "College Math" seeking to cover three levels of calculus, taught by one teacher.[22]

Also, an Advanced Mathematics course (statistics, probability, vectors and number theory) is taught at Central High; however, although a corresponding course had been taught at Girls High in the past, it is not available in the current academic year because only two Girls High students were interested in enrolling in the course.[23]

15. Both schools offer Advanced Placement Chemistry and Physics; however, a Central High student is not required to first take introductory courses in these subjects whereas a Girls High student is required to do so.[24]

16. In the field of social studies, Girls High offers a more extensive program, including courses in Criminal Law, Afro-American History, Consumer Affairs and Current Affairs.[25]

17. Under the mentally gifted program[26] at the two schools[27] for the academic year 1982-83, Central High was staffed with four mentors (counselors) for approximately 328 mentally gifted students.[28] Girls High initially had one mentor for approximately 325 mentally gifted students, although in November of 1982 four more mentors were added.[29].

During this same period of 1982-83, Central High made available to its mentally gifted students 38 courses and seminars, whereas at Girls High a "Course Preference Form" listed seven courses and three seminars in the mentally gifted program plus three "current scheduled course offerings" in French.[30]

18. In the field of musicology, Central High offers a course in Advanced Theory Harmony not offered at Girls High. Also, Central High's program includes participation in percussion, woodwind, string and brass ensembles—an option not available at Girls High.[31]

19. A comparison of the formal athletic programs available at the two schools may be summarized as follows:[32]

| Both Schools | Central High | Girls High |
|---|---|---|
| Basketball | Baseball | Badminton |
| Bowling | Football | Field Hockey |
| Cross-country | Golf | Lacrosse |
| Swimming | Gymnastics | Softball |
| Tennis | Soccer | Volleyball |
| | Track | |
| | Wrestling | |

To fullfill up to 20 percent of state requirements for physical education, students are permitted to include extra-curricular athletic activities. This arrangement, known as "contract gym,"[33] permits the student to use such exempted in-school time for other pursuits, including academic. The "contract gym" option is available to Central High students but not to Girls High students. The availability of the "contract gym" option was one of the reasons which prompted all three student-plaintiffs to seek admission to Central High.[34]

20. The extra-curricular programs conducted at the two schools vary as follows:[35]

| Central High | Girls High |
|---|---|
| Biology Club | Cheerleading[36] |

Chess Club
Computer Club
Magic Club
Meteorological Society
Multiple Strategy
  & Tactics ("War Games")
Photography Club
Salt Water Aquarium
  Society

Future Scientists
  of America
Health Careers Club
Horticultural Club
Review Topics in Chemistry
School Store
Student-Faculty
  Disciplinary Committee
Student Secretaries

### Student Performance at the Two Schools:

21. Testing scores for the Preliminary Scholastic Aptitude Test/National Merit Scholarship Qualifying Test (PSAT/NMSQT) for students from the two schools, for the years 1978 through 1982, were:[37]

| Years | Central High | | Girls High | |
|---|---|---|---|---|
| | Verbal | Mathematics | Verbal | Mathematics |
| 1978-1979 | 44.9 | 50.5 | 42.2 | 44.5 |
| 1979-1980 | 44.3 | 49.5 | 41.9 | 44.6 |
| 1980-1981 | 44.9 | 50.1 | 41.2 | 44.7 |
| 1981-1982 | 43.0 | 49.4 | 41.4 | 43.3 |

For the years 1979-1982, students from the two schools were represented on the National Merit Scholar competition lists as follows:[38]

| Year | Commendation | | Semi-Finalists | | Finalists | |
|---|---|---|---|---|---|---|
| | Central | Girls | Central | Girls | Central | Girls |
| 1979 | 23 | 17 | 11 | 3 | 11 | 3 |
| 1980 | 15 | 19 | 13 | 3 | 13 | 2 |
| 1981 | 13 | 8 | 11 | 4 | 11 | 4 |
| 1982 | 22 | 9 | 8 | 7 | 8 | 5 |
| Totals: | 73 | 53 | 43 | 17 | 43 | 14 |

The resulting percentages of competitors who earned ratings in these three categories, Central High and Girls High respectively, are: "Commendation"—58 percent and 42 percent; "Semi-Finalist"—72 percent and 28 percent; and "Finalist"—75 percent and 25 percent.[39]

22. In the Scholastic Aptitude Tests (SAT) for the academic years 1974 through 1982, Central High students averaged 59.6 points higher on the mathematics test and 17.4 points higher on the

verbal test.[40] Except for the results of the verbal test in 1975, when Girls High students scored 484 to Central High's 481—a difference of three points—Central High students consistently scored higher in both mathematics and verbal testing in each of the eight years.

Nationwide testing for 1981-82 indicates that males generally scored higher than female students on both mathematics and verbal portions of the SAT tests. In 1982, for example, male high school seniors scored an average of ten points higher than females on the verbal portion of the test.[41] However, in that same year, the verbal differential between Central High and Girls High seniors was 29 points—190 percent greater than the national testing average—in favor of Central High students.[42]

23. On the standardized advanced placement tests for the years 1978, 1980, 1981 and 1982 (no data having been provided for Girls High students for 1979), Central High students took 424 examinations and Girls High students took 244 examinations with 64 percent of the total from Central High and 36 percent from Girls High.[43] The overall average scores, respectively, were 3.55 (Central High) and 3.26 (Girls High) for a difference of seven percent. It is to be noted that in these four years: (a) on physics subjects, no Girls High student took the "Physics Elec. Mag." or the Physics Mechanics test, and only four took the Physics B test, whereas approximately 13 times more Central High students took this last test; (b) in Mathematics/Calculus, three times more Central High students took the test;[44] (c) only in Biology and American History were a greater number of examinations taken by Girls High students. Their scores, however, were lower, respectively, 3.23 to 3.54 and 3.09 to 4.39.[45]

24. College admissions offices give consideration to SAT and Achievement Test scores as criteria for admission.[46] For the years 1977-1981, Central High students' average rate of acceptance to colleges was 91.8 percent and for Girls High students the average rate was 87.8 percent.[47]

*Sociological Considerations:*

25. The summaries of witnesses' testimonies in support of single-gender education are:

(a) Sally B. E. Kilgore, Ph.D. in Sociology, and Assistant Professor in Sociology at Emory University, studied a survey of 84 Roman Catholic high schools—51 single-gender (22 male, 29 female) and 33 coeducational—to evaluate student growth in four areas: "vocabulary, math, education aspiration and self-esteem."[48] She concluded that single-gender schooling made a difference only in the area of vocabulary, although the vocabulary test involved only eight words.[49] She testified that the vocabulary difference was "one-third of a word more than co-ed students,"[50] or the equivalent of "about one grade level for both males and females."[51]

(b) Carol Leland, Ph.D. in Education and Sociology, conducted a 1978-1980 study (The Brown Project) involving some 3,000 college students (2,000 women and 1,000 men) in four coeducational and two single-sex colleges, the latter two being Wellesley and Barnard. Dr. Leland testified that female students from single-gender female schools "were likely to have higher aspirations . . . to feel more confident that they were well prepared for graduate school . . . were likely to see their abilities more positively in comparison."[52] She pointed to "faculty supportiveness" as a principal factor for this result.[53] However, she also acknowledged that grade achievements for students from

single-sex and coeducational schools were the same.[54]

(c) Vivian Seltzer, Ph.D., a licensed psychologist and Assistant Professor of Psychology and Education at the University of Pennsylvania Graduate School of Education, expressed the view that, within the educational process, adolescents should be allowed "to develop in their own way, in their own time"[55] and should be given a choice between attending a single-gender school and a coeducational school.[56]

(d) Bernard Kelner, Ph.D. in Education, Associate Superintendent of Schools for District 6 (which includes Central High and Girls High) from 1967 to 1975, and Associate Superintendent for Curriculum and Instruction—opined "that those two schools, are fulfilling the goals of the School District of Philadelphia, and that for the kind of student who desires to go to both Girls and Central, that they are in good environments, educationally strong environments, which are aided by the absence of the opposites sex."[57]

(e) Judge Lisa A. Richette of the court of common pleas and an alumna of Girls High, described her experiences at Girls High:

I was given leadership opportunities that I would not have had in a double-sex environment, because the competition there was not against anyone except myself to achieve more. There were no stereotypes, there were no limits set to what I could do, and I think the absence of sexual stereotyping was the most important thing.[58]

26. The summaries of witnesses' testimonies critical of single-gender education are:

(a) Rhoda K. Unger, Ph.D. in Experimental Psychology and Professor of Psychology at

Montclair State College in New Jersey, favored heterosexual educational settings as "increasing . . . intergroup contact and providing the males with better and a greater number of disconfirming examples which would . . . make . . . group differences decrease more rapidly"; conversely, continuation of single-gender schooling, insofar as male students were concerned, would "maintain their negative biases against women since they're not going to be provided with these disconfirming examples."[59]

(b) Michelle Fine, Ph.D. in Social Psychology, and Assistant Professor of Psychology and Education at the University of Pennsylvania, had interviewed the three student-plaintiffs. Dr. Fine testified that exclusion of qualified female students from an all-male institution has negative effects on the attitude of the general public because it "reinforces the legitimacy of the presumption that males and females need to be treated differently" and that particularly, exclusion from educational institutions carries "strong messages that steroetypes are legitimate and differential treatment of males and females are legitimate."[60] She also testified that the effects on the excluded females "can range from feelings of low self-esteem, feelings of one's sense of inferiority, to feelings of frustration and anger. . . . "[61]

(c) Michael Contompasis, Headmaster of the Boston Latin School, gave testimony based not on theory or opinions but rather on empirical data—actual facts and experiences involving an academic situation strikingly parallel to the one confronting this court. We therefore consider his testimony under a separate, numbered paragraph, which follows.

27. The Boston Latin School (Boston Latin) in

Boston, Massachusetts, is the oldest public school in the United States, having been founded in 1635.[62] It, too, is a "magnet" or special admission school in that it draws its students from throughout the city, and admission is based upon academic performance and qualifying test scores. It also is primarily a college preparatory school, with a student population of 2,250.[63] It differs from Central High in two principal respects: although from 1635 it was an all-male school, in 1972 it became coeducational so that today approximately half of its students are females;[64] it has students from grades seven through 12 as compared to Central High's (and Girls High's) ninth through 12th grades.

Prior to 1972, just as Philadelphia has its Girls High, Boston had its counterpart known as "Girls Latin School" with a student population of approximately 1,500.[65] In 1972, Girls Latin School also became coeducational.

Michael Contompasis, the Headmaster of Boston Latin, dispelled, seriatim, the various negative consequences predicted by theorists advocating retention of single-gender schooling. His testimony is to be evaluated, as based not only upon empirical data but also upon his background and experience: first, himself a student who graduated from Boston Latin when the school was all-male; next, a teacher at Boston Latin for eight years (1968-1976) spanning the period when the school changed from all-male to coeducational; and, third, currently as Headmaster, since 1977.

Specifically, Mr. Contompasis testified that since the school has become coeducational (after 337 years of being an all-male institution): (a) there has been no regression in quality of academic programs, academic achievement, school spirit, atmosphere of learning or dedication on the part of

the students;[66] (b) indeed, "increased . . . involvement" in activities has occurred, with both male and female students being elected as class presidents, achieving valedictorian status, staffing the yearbook, etc.; [67] and (c) a "higher degree of respect for students of opposite sexes [sic]" has been achieved.[68] The verity of this experience is to be evaluated by the time-span of ten years of coeducational experience and by the age-span covering students from 12 years of age through 17 (seventh through 12th grades).[69] Beyond all this, there was an additional change which may be deemed significant: before Boston Latin became coeducational, its teaching and supportive staff was all male (except for the school nurse and women who worked in the cafeteria),[70] and currently the staff at Boston Latin consists of 35-40 percent females, including department heads.[71]

This court finds this empirical data to be compelling in contrast to the tentative predictions and opinions of theorists. It would be obdurate folly to evaluate the evidence otherwise.

*Financial Factors:*

28. The average allocation for the two schools by the School District per student for the four-year period, set forth below, were:[72]

| Year | Central High | Girls High | Difference |
|------|--------------|------------|------------|
| 1978-1979 | $44.43 | $38.46 | $ 5.97 |
| 1979-1980 | 50.89 | 43.45 | 7.44 |
| 1980-1981 | 57.49 | 49.17 | 8.32 |
| 1981-1982 | 71.96 | 59.43 | 12.53 |

However, of this amount, Girls High students received higher per student allocations for basic books and supplies: Central High—$14.12 and $6.69, respectively; Girls High—$14.99 and $7.59, respectively.[73]

Central High, however, receives an athletic allotment of $7,000 annually (for football) which

sum, however, need not necessarily be used for football.[74] Girls High does not receive an off-setting allotment.[75]

29. In 1982, the School District allocated $41,221 to Central High for computer equipment, while at the same time there was allocated to Girls High $15,297 for computer equipment plus $10,125 for typewriters.[76] As noted in Finding No. 12, supra, Central High is equipped with twice as many computers as Girls High—25 to 12.

30. Central High is the only public high school in Philadelphia to receive income and benefits from a private foundation expressly established for the school and its alumni. This private foundation is the "Mary Gaston Barnwell Foundation" ("Barnwell Foundation") established following the death of James G. Barnwell (an alumnus of Central High), commencing with a residuary estate of approximately $320,000.[77] As of September 15, 1982, the assets of the Barnwell Foundation were valued at $664,303.56.[78]

During the 12-year period of 1970-1982, the Barnwell Foundation disbursed $382,145.36 for various activities related to Central High, including: tutorial programs, school handbook, partial subsidy of school publications, Barnwell library, support of undergraduate clubs, as well as various awards, prizes and badges for Central High students.[79]

31. Girls High has a fund of approximately $100,000 to $125,000—accumulated largely from estates of deceased alumnae and teachers.[80] The yield therefrom is applied to printing of the school's handbook and for student scholarships.[81]

Central High also has a fund of approximately $52,000;[82] however, no evidence was presented as to the use of this fund.

32. For approximately four years, Girls High students have engaged in fund-raising drives by selling magazine subscriptions, the proceeds of which are used to support school activities such as clubs, school newspapers and literary magazines. The profits from these fund-raising drives have been: 1979-80—$18,729; 1980-81—$24,650; and 1981-82—$25,581.[83]

Central High students do not engage in any school-wide fund-raising activities.

33. The "highest monetary value of scholarships awarded in . . . Philadelphia" is given to graduates of Central High.[84] In 1979, Central High reported that its graduates gained scholarships with a total value of $1,222,350; at the same time, Girls High reported that its graduates obtained $500,000, or approximately 40 percent of Central High's total scholarships for that year.[85]

*Reputations of the Schools:*

34. Central High has had a large number of illustrious graduates prominent in many fields, including artists, educators, financiers, industrialists, jurists, lawyers, legislators, military men, physicians, public servants, scholars, scientists, writers, etc.[86]

A comparable list for Girls High graduates is absent.[87]

35. Central High's annual alumni "Barnwell Dinners" and "Hall of Fame" gatherings have been able to attract nationally and internationally prominent guests, including: President of the United Nations General Assembly, Alex Quaison Sackey; former Attorney General of the United States, Eliot L. Richardson; Nobel Prize winner, Dr. Howard M. Temin; Vice-President of the United States, Hubert H. Humphrey; Attorney General of the United States, Robert F. Kennedy; former U.S.

Supreme Court Justice, former U.S. Ambassador to the United Nations, and also the former Secretary of Labor, Arthur J. Goldberg; U.S. Senator Richard Schweiker; entertainer Bill Cosby.[88]

A comparable list of such personalities, male or female, appearing before either the alumnae or students of Girls High, is absent.

Girls High has featured the following: 82nd anniversary luncheon in 1971, Dr. Louise Gloecker, first woman president of the American Medical Association; Secretary of the Commonwealth C. Delores Tucker at the 83rd anniversary luncheon.[89]

36. With regard to media publicity in this regional area, Central High has consistently, and materially been the beneficiary of more frequent, comprehensive, and favorable publicity (and therefrom the ensuing favorable reputation) than has Girls High[90]—to the greater benefit of Central High, its students as well as its alumni.

## DISCUSSION

*A Brief Overview of Standards:*

Under the equal protection clause of the Fourteenth Amendment, two standards of review have been applied to test gender-based classifications. First was the "rational relationship" test, which was satisfied if the challenged law was based upon "some rational foundation." Hoyt v. Florida, 368 U.S. 57, 61 (1961).[91] The court later applied a more stringent test, requiring that the challenged governmental action have more than "some legitimacy." Reed v. Reed, 404 U.S. 71, 76 (1971). A new, "substantial relationship" test evolved thereafter, demanding that gender classifications bear a substantial relationship to an important governmental interest. Craig v. Boren, 429 U.S. 190,

reh. den'd, 429 U.S. 1124 (1976). A more recent authority in this area enunciates the test as a "showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.' Wengler v. Druggists Mutual Insurance Co., 446 U.S. 142, 150 (1980) [footnote omitted]." Mississippi Univ. for Women v. Hogan, 102 S.Ct. 3331, 3336 (1982).[92] Indeed, the Hogan Court states that the party seeking to uphold a gender-based classification "must carry the burden of showing an 'exceedingly persuasive justification' for that classification. Kirchberg v. Feenstra, 450 U.S. 455, 461 (1981)." Id. at 3336.[93]

Another factor, at times referred to in judicial opinions sustaining facially-discriminatory action based upon gender, is "benign, compensatory purpose."[94] For example, in Kahn v. Shevin, 416 U.S. 351 (1974), a Florida statute which granted widows a $500 property tax exemption but did not extend similar benefits to widowers was upheld, the court reasoning that: While the widower can usually continue in the occupation which preceded his spouse's death, in many cases the widow will find herself suddenly forced into a job market with which she is unfamiliar, and in which, because of her former economic dependency, she will have fewer skills to offer (footnote omitted). 416 U.S. at 354.[95]

With this brief overview of the applicable legal principles, we turn to the case at hand concerning Central High and Girls High, commencing with the decision in Vorchheimer v. School District of Philadelphia, 400 F.Supp. 326 (E.D. Pa. 1975), rev'd 532 F.2d 880 (3rd Cir. 1976), aff'd by an equally divided court, 430 U.S. 703 (1977).

*Vorchheimer v. School District of Philadelphia:*

The federal proceeding in Vorchheimer involved the same two schools presently before this court and the question of the constitutionality of separate, gender-based schooling. The matter was heard in May of 1975, in a non-jury proceeding before the Honorable Clarence C. Newcomer of the United States District Court for the Eastern District of Pennsylvania. The trial court declined to accept pendant jurisdiction over plaintiff's claim under Pennsylvania's Equal Rights Amendment "since standards governing the applicability of this amendment in the educational field have not been clearly established by the state courts."[96] However, applying the test of "fair and substantial relationship," the court found a denial to plaintiff of equal protection under the Fourteenth Amendment.

On appeal to the Third Circuit Court of Appeals, the majority reversed—with Circuit Judge John J. Gibbons dissenting.[97] Regarding the applicable standard of review, the Third Circuit majority concluded: "We need not decide whether this case requires application of the rational or substantial relationship tests because, using either, the result is the same."[98] 532 F. 2d at 888 (footnote omitted). As stated hereinbefore, this decision of the Third Circuit Court of Appeals was affirmed by an equally divided Supreme Court: 430 U.S. 703 (1977).

*Res Judicata and Collateral Estoppel:*

Pointing to Vorchheimer, defendants in the present proceedings contend that the doctrine of res judicata bars plaintiffs from litigating their equal protection claim; secondarily, that under principles of collateral estoppel, plaintiffs are bound to certain of the findings entered by the trial court in Vorchheimer, namely the following:

24. The admissions standards of Girls High

School are comparable to those of Central High.

25. Graduates of both Central and Girls High, as well as the other senior high schools of Philadelphia, have been and are accepted for matriculation by the best and most prestigious colleges and universities.

26. With the exception of scientific facilities, in which Central is superior, the academic facilities of Central and Girls High are comparable.

28. Central High is the only high school in Philadelphia with a substantial private endowment. However, there is no evidence that as a result of this endowment Central's facilities, faculty, or course of instruction is superior to Girls.

30. In general, it can be concluded that the education available to the female students at Girls is comparable to that available to the male students at Central.[99]

For reasons which follow, we are unable to agree with defendants' contentions.

Initially, we find that the Vorchheimer plaintiff's counsel's representation of plaintiff's cause was materially inadequate.[100] In that proceeding, counsel: (a) propounded one set of interrogatories, consisting of three pages, and limited to seven questions probing superficial areas;[101] (b) deposed only one witness, Matthew W. Costanzo, then-superintendent of schools; (c) presented testimony of only four witnesses: student-plaintiff Vorchheimer; an expert on education; a student from Central High to testify on the history of Central High; and a rebuttal witness, primarily on the validity of a study, additionally on two questions and answers from Superintendent Costanzo's depositions;[102] and (d) offered thirteen exhibits.[103] The Vorchheimer court was not provided with many relevant available data, or was provided with only

tentative and incomplete facts and evidence. This becomes readily apparent when compared to the facts and evidence presented in the instant proceeding, not all of which have been reduced to findings of fact set forth hereinbefore. Specifically, incomplete or no evidence was presented as to the following facts: Girls High students attend classes at Central High (thus undermining the conclusion that "adolescents may study more effectively in single-sex schools");[104] Central High graduates (who have passed all major subjects above ninth grade) are awarded Bachelor of Arts degrees, whereas Girls High graduates receive high school diplomas; there are 2.7 times more Ph.D.'s and 1.5 times more teachers with 21 years (or more) of teaching experience at Central High; Central High's campus is almost three times larger; Central High's library not only contains 50,000 volumes (a fact brought out in Vorchheimer) but Girls High's library contains almost 50 percent fewer volumes at 26,300; the library room and setting at Central High are appreciably more aesthetic; Central High has more instructional equipment,[105] including a separate computer room;[106] both Central High and Girls High offer courses, as well as some club activities, that are not available at the other;[107] additional prerequisites for AP Chemistry and AP Physics are imposed upon Girls High students but not Central High students;[108] Girls High students almost invariably score lower than Central High students in testing on the Preliminary Scholastic Aptitude Test/National Merit Scholarship Qualifying Test, as well as on the Scholastic Aptitude Test (SAT);[109] whereas 91.8 percent of Central High students are accepted into college, four percent less or 87.8 percent of Girls High students are so accepted;[110] Central High students were ben-

eficiaries (at least in 1979) of 1.2 million dollars in college scholarships, whereas Girls High students were beneficiaries of less than half that sum at one-half million dollars;[111] the option of "contract gym," while available to Central High students, is not granted to Girls High students;[112] while students attending Central High have been beneficiaries of some $382,145 over a 12-year period from the Barnwell Foundation, students at Girls High are excluded therefrom,[113] the latter group engaging in annual magazine subscription sales to gain funding.[114]

These facts were either overlooked entirely by counsel in Vorchheimer or, at best, touched upon only superfically and partially. Plaintiff's counsel in Vorchheimer failed to meet the basic standards for adequate representation which require that counsel be "qualified, experienced, and generally able to conduct the . . . litigation. . . ." Wetzel v. Liberty Mutual Insurance Company, 508 F.2d 239, 247 (3d Cir. 1975) (citations omitted). Particularly where "rights of numerous persons not before the Court are at stake," counsel in a class action is expected to protect these rights "with greater vigor and thoroughness, both factually and legally" than would otherwise be required. Johnson v. Shreveport Garment Company, 422 F.Supp. 526, 535 (W.D. La. 1976). This vigorous standard applies to "preparation of pleadings, pretrial motions, discovery, [and] the trial itself, including the presentation of evidence. . . ." Id. at 534-35.[115]

Via a "Joint Statement of Uncontested Facts," counsel in Vorchheimer stipulated inter alia, to the following:

16. The practice of educating the sexes separately is a technique that has a long history and world-wide acceptance.

17.  There are educators who regard education in a single-sex school as a natural and reasonable educational approach.[116]

These stipulations—particularly number 17, which does not set forth either the quality or quantity of the unidentified educators, or the opposing views of other qualified educators—touch upon the very essence of the issues, and can only be assessed as fatally eroding plaintiff Vorchheimer's contentions. Both stipulations were adopted by the trial court,[117] and were also reflected in the Circuit Court's "fair summary of the parties' positions . . . that . . . the . . . school district has chosen to make available . . . the *time honored educational alternative of sexually-segregated high schools. . . .*"[118]

While we do not question that there indeed are "educators who regard education in a single-sex school as a natural and reasonable educational approach," such a concession is meaningless without background information concerning the educators, their qualifications, sources and analyses—as well as those holding opposing views. Too, by the trial time of May 1975, Boston Latin had been functioning as a coeducational institution for some three years, as had Girls Latin—a fact not presented to the Vorchheimer court.[119]

The foregoing litany of inadequate representation compels the conclusion that res judicata may not operate to restrict the present plaintiffs' equal protection claim. Because of these same inadequacies, plaintiffs here are not bound by the findings in Vorchheimer, which findings were based upon the paucity of evidence made available to the court, relating to comparability of the two schools.[120]

There are other reasons which compel this court

to conclude that collateral estoppel does not bar plaintiffs from litigating the facts.[121] Defendants' burden of persuasion of justifying its policy under Pennsylvania's ERA (discussed infra) is greater than either of the two burdens referred to by the Third Circuit Court of Apeals in Vorchheimer. Issue preclusion does not apply where the burdens significantly differ.[122] Additionally, as stated by the U.S. Supreme Court:

[A] subsequent modification of the significant facts or *a change or development in the controlling legal principles may make that determination obsolete or erroneous.* . . . That principle [collateral estoppel] is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 599 (1948) (footnote omitted, emphasis and brackets in original).

Moreover, the preclusive effect of a prior determination of an issue is weakened when based upon stipulations.[123]

We are, therefore, bound to consider the operative impact of Pennsylvania's ERA and approach the facts anew. However, before turning to a discussion of this aspect of the law, we briefly summarize our conclusions under the equal protection clause of the Fourteenth Amendment.

*Equal Protection of the Laws:*

The findings of fact in this proceeding, as summarized in the foregoing recital, establish that the two schools, and in particular the educational opportunities provided, are materially unequal.[124] Particularly in view of the actual experience for the past ten years of the Boston Latin School, the "theory that adolescents may study more effec-

tively in single-sex schools"[125] becomes only that—theory. Indeed, the evidence would indicate that students at Girls High have received, and unless appropriate remedial steps are taken, will continue to receive, disparate schooling—as ultimately reflected over the years in their comparative performances in the academic testings as well as their different percentages of acceptances into colleges and universities.

Applying the substantial relationship test, we conclude that: first, there is absent an "important governmental objective" to be served by maintaining these separate, single-gender public schools; second, that the means employed are not "substantially related" to the vague, unsubstantiated theory of single-gender schooling. Indeed, the very actions of the defendants in permitting Girls High students to take courses at Central High and allowing Central High students to regularly utilize the tennis courts and basketball courts at Girls High, "fatally undermine[ ] [the] claim that women [or men] . . . are adversely affected by the presence of men [or women]."[126]

*The Pennsylvania Equal Rights Amendment:*

Although we have resolved the issue based upon the equal protection clause of the Fourteenth Amendment, as a trial court we are bound to address additional legal issues lest our perceived resolution be subsequently deemed unfounded. Hence, we turn to the question of the legal impact of Article I, Section 28, of the Pennsylvania Constitution, the so-called "Equal Rights Amendment," (ERA) which reads:

*Prohibition Against Denial or Abridgement of Equality of Rights Because of Sex.*

Section 28. Equality of rights under the law shall not be denied or abridged in the Commonwealth of

Pennsylvania because of the sex of the individual.[127]

Following the adoption of the ERA in Pennsylvania in 1971, our Supreme Court applied the amendment in 1974 in four cases: Conway v. Dana, 456 Pa. 536, 318 A. 2d 324 (1974) (striking presumption that the father must accept principal support of minor children); Hopkins v. Blanco, 457 Pa. 90, 320 A. 2d 139 (1974) (extending to the wife the right to claim damages for loss of consortium); Henderson v. Henderson, 358 Pa. 97, 327 A. 2d 60 (1974) (law permitting only the wife to receive alimony pendente lite, counsel fees and expenses, held unconstitutional); Commonwealth v. Butler, 458 Pa. 289, 328 A. 2d 851 (1974) (striking down provisions of Muncy Act which prevented imposition of minimum sentences for women, whereas men received minimum sentences). In Henderson, supra, the court articulated the impact of the ERA as follows:

The thrust of the Equal Rights Amendment is to insure equality of rights under the law and to eliminate sex as a basis for distinction. The sex of citizens of this Commonwealth is no longer a permissible factor in the determination of their legal rights and legal responsibilities. The law will not impose different benefits or different burdens upon the members of a society based on the fact that they may be man or woman. 458 Pa. at 101, 327 A. 2d at 62.(      ).

In 1975, on a motion for summary judgment, the Commonwealth Court was faced with the question of the constitutionality of a provision in the by-laws of a voluntary, unincorporated association whose members included every public senior high school (except those in Philadelphia) as well as some pub-

lic junior high schools and some private schools: Commonwealth, Packel v. Pennsylvania Inter- scholastic Athletic Association, 18 Commw. Ct. 45, 334 A. 2d 839 (1975). The challenged provision read: "Girls shall not compete or practice against boys in any athletic contest."[128] The court (Presi- dent Judge Bowman dissenting on procedural grounds) struck down this provision as being viola- tive of the ERA. In so doing, the majority declared:

"[E]ven where *separate teams* are offered for boys and girls in the *same sport,* the most talented girls may still be denied the right to play at that level of competition which their ability might otherwise permit them." 18 Commw. Ct. at 52, 334 A. 2d at 84 (Emphasis added.)

Thus, under Pennsylvania's ERA, the separate- but-equal concept under the equal protection clause of the Fourteenth Amendment (as applied in Vorchheimer, supra) does not have currency. If males and females are to be allowed to compete together in the athletic arena, potentially including contact sports,[129] there can be no reason for barring intellectual interplay in the classroom. On the con- trary, as the Boston Latin experience has demon- strated, such inter-gender exposure can mutually promote and maintain scholastic achievement.

However, another line of reasoning also supports the assertion that under the ERA, separate, single-gender public schooling is impermissible.

Pennsylvania's ERA and the proposed 27th Amendment to the U.S. Constitution (federal ERA) are essentially mirror copies.[130] In Frontiero v. Richardson, supra, a plurality (four justices) deemed "classifications based upon sex . . . [to be] inherently suspect, and [therefore] must . . . be subjected to strict judicial scrutiny."[131] Another three justices (Powell and Blackmun, JJ., joined by

Burger, C.J.), while concurring with the result, expressed the view that it was "unnecessary for the Court in this case to characterize sex as a suspect classification," stating that the "Equal Rights Amendment . . . if adopted will resolve the substance of this precise question. . . . "[132] Thus, with the ERA placed on the scale, at least a majority of the justices of the Supreme Court would categorize classifications based upon sex as being "inherently suspect" and therefore subject to strict judicial scrutiny.[133]

Nine years ago, in Henderson v. Henderson, supra, our Pennsylvania Supreme Court had declared that the "thrust" of the Pennsylvania ERA was "to eliminate sex as a basis for distinction."[134] To equate this "thrust" of the Pennsylvania ERA with the standard of "substantial relationship" is to suggest that our legislature and the citizens of this Commonwealth engaged in an empty act, notwithstanding the sober and deliberate process involved in adding a provision to our State Constitution. We are not prepared to adopt such trumpery.

Rather, reading the plain and simple words of the ERA, we hold that it triggers application of strict judicial scrutiny whenever gender-based discrimination emanates from statutes, regulations, rulings and similar governmental action.

Applying the strict judicial scrutiny test, we conclude that there does not exist a compelling governmental interest in maintaining the two schools as separate, single-gender institutions; and, further, that the means used to achieve the concept of single-gender schooling belies the professed, but vague, interest asserted by defendants of "providing . . . students academic *options* to improve the quality of education offered."[135]

## CONCLUSIONS OF LAW

1. The certification of this proceeding as a class-action matter under the provisions of Pa.R.C.P. 1702, is hereby confirmed; further, the criteria set forth in Pa.R. C.P. 1708 for maintenance of a class-action proceeding have been met and satisfied; further, the representative parties, the named plaintiffs, have fairly and adequately asserted and protected the interests of the class.

2. Statutes, regulations, rulings and the like, emanating from governmental action, which discriminate between persons based on gender, must—under the equal protection clause of the Fourteenth Amendment—serve important governmental objectives; further, the means employed must at least be substantially related to achievement of those objectives. "The burden . . . is on those defending the discrimination to make out the claimed justification. . . ."[136] Defendants in this proceeding have failed to satisfy either criterion and, hence, have failed to meet their burden.

3. The maintenance of single-gender public schools[137]—specifically in this instance, Central High School (for males only) and Philadelphia High School for Girls (for females only)—does not serve an important governmental objective; moreover, the means employed in the maintenance of these two schools are not substantially related to the proffered governmental objective.

4. The maintenance of these two public schools as single-gender institutions is in violation of the equal protection clause of the Fourteenth Amendment, to the particular detriment of the named plaintiffs and the representative class.

5. Statutes, regulations, rulings and the like, emanating from governmental action, which dis-

criminate between persons based on gender, are—under Article I, Section 28 (the "Equal Rights Amendment") of the Constitution of the Commonwealth of Pennsylvania—subject at least to the test of "strict judicial scrutiny"; that is to say, they must serve a compelling interest, and the means adopted to achieve the goal must be necessary and, where applicable, precisely drawn.

6. Defendants in this proceeding have failed to satisfy either criterion of "strict judicial scrutiny" and, hence, have failed to meet their burden.

7. The maintenance of the two, single-gender public schools sub judice is in violation of the provisions of Article I, Section 28, of the Constitution of the Commonwealth of Pennsylvania.

Wherefore, there is entered the following

## FINAL DECREE

And now, September 28, 1983, after hearing, consideration of the evidence, the oral arguments and briefs of the parties (including those of amici curiae), the findings of fact and the conclusions of law, and hearing on exceptions thereon, it is hereby adjudged, ordered and decreed that:

1. The exceptions by defendants—Board of Public Education, School District of Philadelphia, Constance E. Clayton as Superintendent of Schools, Richard D. Hanusey as Associate Superintendent for Field Operations—to the extent not otherwise reflected in the foregoing amended findings of fact and conclusions of law, are *overruled and dismissed;*

2. Said defendants and their agents, employees, officers and successors, are enjoined from barring admission of students to Central High School based solely upon gender;

3. This court is to retain jurisdiction of this pro-

ceeding for purposes of ensuring compliance with the terms of this final decree as well as the orders previously entered;

4. Any appeal from this final decree or any portion thereof, shall not operate as an automatic supersedeas under Pa.R.App.P. 1736(b).

---

1. The parties stipulated that the class consists of all female students who are, or would be, eligible for admission to Central High School, but for their sex; further that the requisites of Pa.R.C.P. 1702 have been met.

2. Article I, Section 28: "Equality of rights under the laws shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual."

Plaintiffs also point to a memorandum dated September 5, 1972, titled "Sexism in Education," from the Secretary of Education to all school administrators, issued pursuant to the above-quoted amendment: Exhibit P-106. This memorandum articulates six "policies . . . upon which the public schools in the Commonwealth will be evaluated" as follows:

(1) Sex-segregated and sex-stereotyped classes, programs, activities, and courses of study be eliminated.

(2) Feminist literature be included in school libraries and efforts be made to secure instructional materials, including textbooks, which favorably portray women in non-traditional roles.

(3) All students be counseled to consider a variety of career opportunities, not only those traditionally entered by persons of their sex.

(4) Job placement practices assure students of employment opportunities without restriction because of sex.

(5) Annual goals be set for hiring, training and promoting women of all races at every level of employment.

(6) The role of women becomes an integral part of the school curriculum.

3. Article I, Section 1: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."

Article I, Section 26: "Neither the Commonwealth nor any political subdivision therof shall deny to any person the enjoy-

ment of any civil right, nor discriminate against any person in the exercise of any civil right."

4. In part: " . . . nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

5. Defendants assert that this Court is restricted to certain of the findings articulated by the trial court in the matter of Vorchheimer v. School District of Philadelphia, 400 F. Supp. 326 (E.D.Pa. 1975) wherein the U.S. District Court in a case involving the same two schools, had concluded that the Philadelphia school district's policy of barring admission of female students to Central High School violated the equal protection clause of the Fourteenth Amendment. On appeal, the trial court's decision was reversed: Vorchheimer v. School District of Philadelphia, 532 F. 2d 880 (3d Cir. 1976), aff'd by an equally divided court, 430 U.S. 703 (1977). This issue is addressed in our "Discussion," infra.

6. Dr. Charles A. Highsmith, the then-acting superintendent, had been originally named.

7. One of the distinguishing features of a "magnet" or special admission school is that students are drawn from throughout the Philadelphia school system, whereas the "comprehensive" or neighborhood schools draw students from defined areas within Philadelphia.

8. Exhibit P-9: "Office for Field Operations, Information on Special Admission Schools Admission," September, 1973, p. 5.

9. Id., pp. 5-6.

10. Plaintiffs' Requests for Admission (hereafter "Requests for Admissions"), No. 26. (References herein to "Requests for Admissions" are made only where the corresponding response had admitted the truth of the requested admission.) However, as of August 1975, the School District apparently operated three other single-gender schools: Edison High School and Benjamin Franklin High School, both for males only; and the Kensington High School, for females only. "Findings of Fact" No. 31, Vorchheimer v. School District of Philadelphia, 400 F. Supp. 326 E.D. Pa. 1975). Sometime during the ensuing eight year period, the School District disbanded the single-gender nature of these three high schools. As of 1942 there was also the South Philadelphia High School for Girls, then a single-gender school: N.T. 1286, Judge Lisa A. Richette.

Also see: N.T. 1123, Dr. Bernard Kelner, Associate Superintendent for Curriculum and Instruction.

11. In each of the following subjects, two students from Girls High took courses at Central High: MG Linear Algebra, MG Calculus, and AP Physics. Requests for Admissions, No. 122. ("MG" is the abbreviation for "mentally gifted" and "AP" for "advanced placement." Under certain conditions, students may receive college credits for AP courses.)

12. The course was in Russian language.

13. Stipulation of Fact ("Stipulation") No. 3. The authority to grant such degrees was by Act of Assembly of April 9, 1849:

[T]he Controllers of the Public Schools of the First School District of Pennsylvania shall have and possess the power to confer academic degrees in the arts upon graduates of the Central High School, in the City of Philadelphia, *and the same power to confer degrees, honorary and otherwise, which is now possessed by the University of Pennsylvania.* (Emphasis added.)

This power was continued under the terms of the Public School Code of 1949, 24 Pa.C.S.A. §16-1611.

Central High graduates who fail a major subject after ninth grade receive diplomas: Requests for Admissions, No. 17.

14. Requests for Admissions, Nos. 44-48 and 54. The averages and the resulting differences are calculated based upon data admitted by defendants.

15. The breakdown for the five-year period of 1978-1983, is as follows:

| | Ph.D.'s (percent) | | 21 Years Experience (percent) | |
| --- | --- | --- | --- | --- |
| | Central | Girls | Central | Girls |
| 1978-1979 | 8.4 | 5.3 | 43.3 | 33.6 |
| 1979-1980 | 10.3 | 4.1 | 47.1 | 35.0 |
| 1980-1981 | 10.6 | 3.3 | 53.3 | 33.7 |
| 1981-1982 | 10.6 | 2.5 | 56.0 | 31.2 |
| 1982-1983 | 5.0 | 1.3 | 48.3 | 26.0 |
| Averages: | 8.9% | 3.3% | 49.5% | 31.9% |

Requests for Admissions, Nos. 49-52.

16. To the parties' knowledge, Central High is the only high school in the United States whose chief administrator bears the title "President." Stipulation No. 5.

In passing, it may be noted that there is a third title used in the Philadelphia school system: the chief administrator of the "Parkway Program" is known as "Director": Requests for Admission, No. 22; Stipulation No. 6.

17. Exhibits P-11 and 12.

18. The court, with counsel for the parties, made a tour of both schools, at which time the facilities were inspected and photographs taken.

19. Requests for Admissions, Nos. 31-33.

20. Request for Admissions, Nos. 35-36, 41; Stipulation No. 7.

21. Dr. Howard Carlisle, President of Central High, testified that in the 1982-83 academic year, the first level course in Russian language was not offered due to lack of student interest. N.T. 1187. Requests for Admissions, No. 64.

22. For explanation of the term "Advanced Placement" see footnote 11, supra; and footnote 44, infra. N.T. 941-42, Dr. Alexander Tobin, Director of Mathematics for Philadelphia School District.

23. N.T. 1218-22, 1246 Marion Street, Principal of Girls High.

24. N.T. 322-323.

25. Requests for Admissions, No. 44.

26. The regulations of the Pennsylvania Department of Education, 22 Pa. Code §341.1, require special programs for the "mentally gifted," generally those with "an IQ of 130 or higher." Also see testimony of Sylvan Bonni, a mentor at Central High School: N.T. 184, 188.

27. Central High had offered MG courses and seminars from 1979; from the available evidence, it appears that Girls High first offered seminars in 1982 and "courses" in 1981. Exhibits P-45 to 52; D-24.

28. N.T. 180-81, 189. Sylvan Bonni, MG mentor at Central High.

29. N.T. 764-67, 778-79. Joyce Whitehead, Vice-principal of Girls High.

30. Exhibits P-49 and D-24.

31. Requests for Admissions, No. 68.

32. Requests for Admissions, Nos. 77 and 78.

33. N.T. 663. Felix Cataldo, Philadelphia School District, Director of Physical and Health Education.

34. N.T. 38, Jessica Bonn; N.T. 93, Pauline King; N.T. 133, Elizabeth Newberg. For plaintiffs' other reasons for applying to Central High see, respectively, N.T. 38-42, 44-45; N.T. 91-95; and N.T. 130-133.

35. Requests for Admissions, Nos. 71 and 72.

36. Cheerleading by Girls High students at Central High's

athletic events, however, ceased a year ago. N.T. 642-644. Marion Street, Principal of Girls High.

37. Exhibits P-61 to 64 and P-66 to 69. The PSAT/NMSQT is administered by the College Board to high school sophomores and juniors. N.T. 933. Dr. Jules Grosswald, Acting Director of Research, Planning and Evaluation for the School District of Philadelphia.

38. Requests for Admissions, Nos. 115-116.

39. At least for the year 1982, when the Girls High student population was larger by 321 students (1,416 to 1,095: see "Finding of Fact," No. 7, supra), the resulting percentages would be further accentuated.

40. Exhibits P-75 to P-78. The results were as follows ("M" for mathematics, "V" for verbal):

| Year | Central High (M) | (V) | Girls High (M) | (V) | Difference (M) | (V) |
|---|---|---|---|---|---|---|
| 1974-75 | 525 | 490 | 475 | 484 | 50 | 6 |
| 1975-76 | 522 | 481 | 466 | 484 | 56 | -3 |
| 1976-77 | 504 | 470 | 455 | 463 | 49 | 7 |
| 1977-78 | 523 | 469 | 455 | 462 | 68 | 7 |
| 1978-79 | 502 | 472 | 447 | 439 | 55 | 33 |
| 1979-80 | 524 | 470 | 448 | 436 | 76 | 34 |
| 1980-81 | 510 | 463 | 449 | 437 | 61 | 26 |
| 1981-1982 | 523 | 475 | 461 | 446 | 62 | 29 |
| Averages: | 517.6 | 473.7 | 457 | 456.3 | 59.6 | 17.4 |

41. N.T. 1040-42. Dr. Jules Grosswald.

42. Exhibits P-75 and P-77.

43. Exhibits P-83 to P-88, and P-90 to P-92. Based upon the data provided, the following is a summary:

| Subject | Central High No. of Exams. | Average Score | Girls High No. of Exams. | Average Score |
|---|---|---|---|---|
| Amer History | 66 | 3.54 | 85 | 3.23 |
| Biology | 33 | 4.39 | 80 | 2.93 |
| Chemistry | 111 | 3.35 | 6 | 3.00 |
| Eng. Comp. | 79 | 3.30 | 48 | 3.85 |
| Math/Calculus | 63 | 3.80 | 21 | 3.19 |
| Physics/Elec. | 10 | 4.30 | 0 | — |
| Physics B | 51 | 3.33 | 4 | 4.50 |
| Physics Mech. | 11 | 4.00 | 0 | — |
| Totals/Averages: | 424 | 3.55 | 244 | 3.26 |

44. All Central High students taking the test took the "BC

level," whereas of the 21 Girls High students taking the same test, only five took the BC level with the remaining 16 taking the "AB level" test, a lower level of test. Those who pass the AB level may be eligible for one semester of college calculus credit, whereas those who pass the BC level may be eligible for two semesters of college calculus credit. N.T. 360-361. Dr. Mary Gray, Professor of Mathematics, American University.

45. Footnote 43, supra.

46. N.T. 1013. Dr. Jules Grosswald.

47. Defendants' Answer to Plaintiff's Interrogatory No. 23(b).

48. N.T. 823.

49. N.T. 838. Dr. Jules Grosswald opined that a test utilizing even 45 vocabulary questions would be inadequate testing. N.T. 1022.

50. N.T. 845-846.

51. N.T. 817.

52. N.T. 901. However, Dr. Leland acknowledged that senior women at coeducational Brown University "express more confidence in their leadership skills than women at single sex schools." N.T. 915.

53. N.T. 905.

54. N.T. 899. But see N.T. 909.

55. N.T. 1067.

56. N.T. 1072-1073.

57. N.T. 1137.

58. N.T. 1283.

59. N.T. 521. The witness explained the term "disconfirming examples" as "examples of individuals who do not show the stereotypes that everybody has believed existed in them . . . it's much harder to have a belief about a group in general if you are provided with example after example of people who don't conform to that image of what that group is supposed to be." N.T. 514.

60. N.T. 562-563. The witness further expounded that "in the absence of females in an all-male institution, teachers, administrators and students . . . don't have access to those [female] students and to the kinds of disconfirming evidence of female academic competence that those students might display" and that a "hidden curriculum" is taught which instructs that "females do not need to be present for education to be optimal." N.T. 564-565.

61. N.T. 567.

62. Central High was founded in 1836, some 200 years later; Girls High originated in 1848 as a teacher training school ("Girls' Normal School") and was reorganized in 1893 to Philadelphia High School for Girls. Requests for Admissions, No. 6; Exhibit P-3.

63. N.T. 1321-1323. Michael Contompasis, Headmaster.

64. Id., 1323-1324.

65. Id., 1328.

66. Id., 1324-1326.

67. Id., 1325, 1335-1336.

68. Id., 1326.

69. Id., 1322.

70. Id., 1337.

71. Id., 1338-1339.

72. Defendants' response to Requests for Admissions, No. 56.

73. Requests for Admissions, Nos. 44-45, 55.

74. N.T. 655-656, 659, 680. Felix A. Cataldo, Director of Physical and Health Education.

75. Id., 656.

76. Requests for Admissions, No. 57; also see N.T. 691-693, Peter L. Rasmussen, Budget Analyst in the Office for Field Operations, School District of Philadelphia.

77. Requests for Admissions, No. 155.

78. Requests for Admissions, No. 163.

79. Requests for Admissions, No. 170. In addition, during 1972-1982, the Barnwell Foundation also made special grants to Central High including expenditures in the following approximate amounts: video-cassette and color receiver—$3,000; video-cassette players, monitor, etc.—$6,000; videotape library—$3,500; updating computer mathematics program—$3,700. Stipulation, No. 11.

80. N.T. 1255. Marion Street, Principal of Girls High; N.T. 1305, Stipulation.

81. Id., 1225-1226, 1304.

82. N.T. 1305, Stipulation.

83. Exhibit D-23; N.T. 1226-1228. Marion Street, Principal of Girls High.

84. P-101: letter dated December 8, 1980 from Howard Carlisle, President of Central High, to parents of prospective high school students.

85. Id., in particular the attachment to the President's letter entitled "perspective," issued November 1979.

The student populations at the two schools for the academic year 1978-79 were: Central —1,758; Girls High—2,136. Requests for Admissions, Nos. 44, 45. The number of seniors at Central High or Girls High for that academic year is not known. Id.

86. P-1, "Handbook of the Central High School of Philadelphia," pp. 241-258. Also see, Requests for Admissions, Nos. 177-185, focusing primarily on the current judiciary in Eastern Pennsylvania: Justice Robert N. C. Nix, Jr. of the Pennsylvania Supreme Court; one on the U.S. District Court (Hon. Charles R. Weiner); one member of the U.S. Bankruptcy Court; 22 on the Court of Common Pleas (plus three alumnae of Girls High); four on the Municipal Court; also a former President of the American Bar Association and former Chancellor of the Philadelphia Bar Association (Bernard G. Segal, Esq.) This list is not complete: see testimony of Babette Josephs, mother of student-plaintiff, Elizabeth Newberg. N.T. 157-158. Ms. Josephs explained that Central High's historic reputation was one of the motivating factors in seeking admission for her daughter into Central High. N.T. 159.

87. This court has perused P-133, a compilation of the "Alumnae News" for Girls High, from June 1979 through June 1982. Further combing the evidence submitted, we are able to point to only seven comparably outstanding alumnae: Dr. Louise Gloecker, first woman presdent of the American Medical Association (Exhibit D-42); Theresa Brown, co-host of KYW-TV's "Evening Magazine" (Exhibit D-43); Hon. Virginia Wright Knauer, Special Assistant for Consumer Affairs, 1969-1977 (Exhibit D-44); Hon. C. Delores Tucker, Secretary of the Commonwealth of Pennsylvania (Exhibit D-45); and three members of the Court of Common Pleas: see footnote 86, supra.

88. Requests for Admissions, Nos. 203, 208-210, 213, 217, 222.

89. Exhibits D-42 and D-45.

90. Requests for Admissions, Nos. 132-136, 141, 224; Exhibits P-94 to 98, P-150, D-54, D-60, 61, D-64.

91. Williams v. McNair, 316 F. Supp. 134 (D.C., S.C. 1970), aff'd, 401 U.S. 951 (1971) (denial of admission of males to all-female Winthrop College upheld) articulated the test as follows:

"It is only when the discriminatory treatment and the varying standards, as created by the legislative or administrative

classification are arbitrary and wanting in any rational justification that they offend the Equal Protection Clause." 316 F. Supp. at 136.

92. Hogan, a male nurse, sought admission to the school of nursing of an all-female university. Applying the rational relationship test, the trial court had denied admission. The Fifth Circuit Court of Appeals, applying the "substantial relationship" test, reversed; on appeal, the Supreme Court affirmed the judgment of the circuit court with, however, four justices dissenting: Burger, C.J.; Blackmun, J.; and Powell, J. joined by Rehnquist, J.

Other U.S. Supreme Court cases applying the substantial relationship test in gender-based challenges include: Kirchberg v. Feenstra, 450 U.S. 455 (1981) (Louisiana law which gave husband, as "head and master," the unilateral right to dispose of jointly owned property; held unconstitutional); Wengler v. Druggists Mutual Insurance Co., 446 U.S. 142 (1980) (Missouri law requiring widower to show dependence for worker's benefits, whereas a widow not so required; held unconstitutional); Craig v. Boren, 429 U.S. 190 (1976) (Oklahoma law prohibiting sale of 3.2 percent beer to males under 21 and to females under 18 years of age; held unconstitutionally discriminatory).

93. Earlier, in Frontiero v. Richardson, 411 U.S. 677 (1973), a plurality of four justices categorized gender-based discrimination as follows:

"[C]lassifications based upon sex, like classifications based upon race, alienage, and national origin, *are inherently suspect*, and must therefore be subjected to *strict judicial scrutiny*." 411 U.S. at 688 (emphasis added.) In passing, it is noted that previously, in Kahn v. Shevin, 416 U.S. 351, 357 (1974), Justice Brennan in a dissent joined by Justice Marshall, articulated this same view. However three justices—Justice Powell, joined by Chief Justice Burger and Justice Blackmun—were not prepared to shift into this "strict scrutiny" standard in Frontiero, one reason being that the so-called Equal Rights Amendment—not yet adopted—was awaiting ratification by the states. 411 U.S. at 692.

94. Mississippi Univ. for Women v. Hogan, supra, at 3338, citing to Wienberger v. Wisenfeld, 420 U.S. 636, 648 (1975).

95. See also, Frontiero v. Richardson, 411 U.S. 677, 689, footnote 22:

It should be noted that these statutes [which presume that spouses of male members of the armed forces are dependents, whereas spouses of female members must prove dependency] are not in any sense designed to rectify the effects of past discrimination (citations omitted). On the contrary, these statutes seize upon a group—women—who have historically suffered discrimination in employment, and rely on the effects of this past discrimination as a justification for heaping on additional economic disadvantages (citations omitted).

96. 400 F. Supp. at 333 (citations omitted). Although the Pennsylvania Equal Rights Amendment had been the law of this Commonwealth since May 18, 1971, and although the complaint in Vorchheimer had been filed in March of 1974, it was not until May of 1975—just a few days before trial was to commence—that counsel for plaintiff Vorchheimer injected the issue of the Equal Rights Amendment into the case. See Docket Entries, Exhibit "A" to "Affidavit of Arthur H. Bryant in Opposition to Defendant's Motion for Partial Summary Judgment and Motion in Limine;" (hereinafter "Bryant Affidavit") also p. 2 of proceedings before Judge Newcomer, May 28, 1975.

97. 532 F. 2d 880 (1976).

98. However, immediately preceding this quoted portion, the majority summarized its reason for its holding:

" . . . given the objective of a quality education and a controverted, but respected theory that adolescents may study more effectively in single-sex schools, the policy of the school board here does bear a substantial relationship." 532 F. 2d at 888.

99. Defendants' "Motion for Partial Summary Judgment and Motion in Limine," pp. 4-5 and 7.

100. Where res judicata is at issue, a subsequent court must make its own inquiry and determination as to the adequacy of representation in the prior proceeding: Gonzales v. Cassidy, 474 F. 2d 67, 74 (5th Cir. 1973).

101. Plaintiffs' interrogatories posed questions relating to: admission requirements; student enrollments from 1954; number of black students enrolled and graduated; number of merit finalists; school capacities; average classroom sizes; number of faculty and administrative personnel-degrees held, subjects taught, years of teaching experience; identities of officers of alumni(ae) groups; list of single-sex schools in the school district; and "[s]tatus of plans to sexually integrate such schools." Exhibit C, Bryant Affidavit.

102. Vorchheimer trial transcript, May 28-30, 1975, pp. 11-71, 192-207, and 254. Plaintiffs' total case-in-chief, including cross-examination, colloquies, etc. consisted of some 76 pages.

103. Id. at 253.

104. Vorchheimer, supra, 532 F. 2d at 888. In passing, it may also be pointed out that Central High students regularly go to Girls High for tennis and basketball activities—thereby further eroding the proclaimed benefits of insulating the two sexes in an academic setting.

105. While the trial court in Vorchheimer was apprised of Central High's planetarium and cyclotron—as were we—in that proceeding no other evidence comparing instructional equipment was presented.

106. Central High, with a smaller student population, has more than twice the number of computers of Girls High. See "Findings of Fact" No. 12, supra. As to importance of computer knowledge, see N.T. 345-46, Dr. Mary Gray, Professor of Mathematics, American University.

107. "Findings of Fact," supra, Nos. 13-20.

108. Id., No. 15.

109. Id., Nos. 21-23.

110. Id., No. 24.

111. Id., No. 33.

112. Id., No. 19.

113. Id., No. 30.

114. Id., No. 33.

115. Accord: Bowen v. General Motors Corp. AC Spark Plug Division, 542 F. Supp. 94, 100 (N.D. Ohio 1981) aff'd 685 F. 2d 160 (6th Cir. 1982); Amos v. Board of School Directors of the City of Milwaukee, 408 F. Supp. 765, 773 (E.D. Wisc. 1976). See footnote 96, supra, relating to counsel's last-minute assertion of the Pennsylvania ERA.

116. Exhibit N, Bryant Affidavit.

117. 400 F. Supp. at 329, Nos. 32-33.

118. 532 F. 2d at 882 (Emphasis added.)

119. There surely were a myriad of ready sources through which informational leads and data might have been gathered, commencing with or including the National Education Association.

120. See test immediately prior to footnote 99, supra, listing the five findings to which defendants seek to bind plaintiffs.

121. Plaintiffs have, correctly, contended that defendants' failure to assert the defense of collateral estoppel as New Matter constituted a waiver thereof. Dilks v. Flohr Chevrolet, 411 Pa. 425, 428 n. 4, 192 A. 2d 682 (1963); Pa.R.C.P. 1030. However, we have elected to consider the issue. "Res judicata" had been pleaded as New Matter by defendants.

122. Restatement Second, Judgments, §28(4). "[T]he process by which the issue was adjudicated cannot be reconstructed on the basis of a new and different burden." Id., comment f.

123. An issue is not litigated for purposes of collateral estoppel "if it is the subject of a stipulation between the parties." Lebeau v. Lebeau, 258 Pa. Super. 519, 525, 393 A. 2d 480, 483 (1978). See text accompanying footnotes 114-17, supra.

124. To provide but one example of the consequences of inequality of opportunities: the course in advanced mathematics, though taught at Central High, was eliminated at Girls High because only two Girls High students were interested in taking the course: see "Findings of Fact" No. 14, supra. If these two female students were enrolled in Central High, they would not have been so deprived.

It may well bespeak to something more than mere chance that in all these years, there is no known instance where a Central High student has sought to enroll in, or transfer to, Girls High.

125. Vorchheimer, supra, 532 F. 2d at 888.

126. Hogan, supra, 102 S.Ct. at 3339.

127. The proposed 27th amendment to the U.S. Constitution reads:

"Equality of rights under the law shall not be denied or abridged by the United States or any State on account of sex."

128. Id. at 48, 334 A. 2d at 840. The athletic association regulated the following interscholastic competitions: archery, badminton, baseball, basketball, cross-country, field hockey, football, golf, gymnastics, lacrosse, soccer, softball, swimming, tennis, track, volleyball and wrestling.

129. On this point, the majority suggested: If any individual girl is too weak, injury-prone, or unskilled, she may, of course, be excluded from competition on that basis but she cannot be excluded solely because of her sex without regard to her relevant qualifications. We believe that this is what our

Supreme Court meant when it said in [Commonwealth v. Bu-

130. See footnote 127, supra, and the Pennsylvania ERA recited thereat in the body of this Discussion. For background history of the Pennsylvania ERA and its relationship to the proposed federal ERA, see 14 Duq.L.Rev. 683 (1976), "A Review of the Implementation of the Pennsylvania Equal Rights Amendment."

131. 411 U.S. at 688. Frontiero was decided on the basis of the due process clause of the Fifth Amendment.

132. Id. at 691-92.

133. To pass the "strict scrutiny" test, a challenged statute must be found by the court to be "necessary to promote a compelling state interest." Kramer v. Union Free School Dist., 395 U.S. 621, 627 (1969). Where a classification is inherently suspect, it is subject to strict scrutiny, and must be "necessary to promote a *compelling* governmental interest. . . . " Graham v. Richardson, 403 U.S. 365, 376 (1971) (Emphasis in original.)

134. 458 Pa. at 101, 327 A. 2d at 62.

135. Defendants' "Brief In Opposition to Plaintiffs' Motion for A Preliminary Injunction," p. 26. Defendants' articulation of their interest, continues: "Through the maintenance of single-sex high schools, the School District seeks to provide a scholastic environment highly conducive to adolescent development and academic achievement." Id.

136. Wengler v. Druggists Mutual Insurance Co., 446 U.S. 142, 151 (1980). Kirchberg v. Feenstra, 450 U.S. 455, 461 (1981): "the burden remains on the party seeking to uphold a statute that expressly discriminates on the basis of sex to advance an 'exceedingly persuasive justification' for the challenged classification (citations omitted)."

137. We limit our holding to "gender-based discimination that emanates from the Commonwealth through its statutes, court rulings or official policies or through the egis of governmental action under the state action test" and not to "private gender-based discrimination:" Murphy v. Harleysville Mutual Insur. Co., 282 Pa. Super. 244, 257, 422 A. 2d 1097, 1104 (1980).

tler, 458 Pa. 289, 328 A. 2d 851 (1974)] that "sex may no longer be accepted as an exclusive classifying tool." 458 Pa. at 296, 328 A. 2d at 855.